GUS BLASS COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 5484. Promulgated July 8, 1947.

*Frank J. Wills, Esq.,* and *E. Chas. Eichenbaum, Esq.,* for the petitioner.

*E. G. Sievers, Esq.,* for the respondent.

22

28

32

## OPINION.

Tyson, *Judge*: (1) *Profit from installment sales.*—The first issue, presenting the question of whether the petitioner's income of the fiscal year ended January 31, 1940, should be increased by $99,681.30, arises in the following manner: The petitioner was on the accrual basis, except that with respect to installment sales it annually posted 50 per cent of its uncollected installment receivables at the end of the year to an unrealized profit account, and on its returns it deducted from income the amount by which that account disclosed an increase, or included in income the amount by which it disclosed a decrease, over the preceding year. The petitioner had used this method consistently, and the increases in the respective amounts of $17,231.01, $41,251.15, and $23,720, were deducted on its original returns for the fiscal years ended January 31, 1940, 1941, and 1942.[1] Upon consideration of the returns

---

[1] References to any taxable year of the petitioner when hereinafter made by stating the year only, should be read as meaning a fiscal year ended January 31, unless otherwise indicated.

for those years and after extended hearings on the petitioner's protest, the respondent concluded that the petitioner was not entitled to use the installment method, determined that its income from installment sales should be computed on the accrual basis, and denied the deductions claimed on the returns in the amounts above stated.

The petitioner does not contest the disallowance of the deduction of the increases in the unrealized profit account, nor does it complain of the respondent's action in placing it on the accrual basis. In its assignment of errors it charges that, since the respondent required it to change from the installment to the accrual method of reporting income, he should have included under his regulation hereinafter set out, in petitioner's taxable income of the year 1940, in which the change was made, the balance of $99,681.30 standing in the unrealized profit account at the close of the preceding year 1939.

When the method of reporting income is changed it is necessary in certain cases to make some adjustment to protect the taxpayer and the revenue. The Commissioner's regulations provide that a taxpayer seeking to change his method must secure the consent of the Commissioner and file with his return an application for permission to change, setting forth all items which are affected; and permission will not be granted unless the taxpayer and the Commissioner agree to the terms and conditions under which the change will be effected. Regulations 103, sec. 19.41–2. See *Ross B. Hammond, Inc.*, 36 B. T. A. 497, 505; affd., 97 Fed. (2d) 545; *Estate of L. W. Mallory*, 44 B. T. A. 249. Where the taxpayer applies for a change from the installment to the straight accrual method, and permission is granted, the regulation provides that:

The taxpayer will be required to return as additional income for the taxable year in which the change is made all the profit not theretofore returned as income pertaining to the payments due on installment sales contracts as of the close of the preceding taxable year.

The petitioner contends that the Commissioner's acts herein are tantamount to approval of a request by it to change to the accrual method; that its income from installment sales can not be clearly reflected on any other basis than the accrual basis; and that. therefore, the $99,681.30 should be included in its income for the year 1940, as required by the above quoted provision of the regulations. If the petitioner should prevail in this contention, the $99,681.30 will be added to its base period income and there will be a resulting increase of a large amount in the excess profits tax credit to be used in computing the petitioner's excess profits taxes for the years 1941 and 1942.

At the opening of the trial the respondent filed an amended answer admitting "that in his deficiency notice [he] required the petitioner to account for profits on installament sales on the accrual basis," and

alleging that he erred in so doing. He contends that this admission of error removes from our consideration any question of change in method of reporting income; and that, under the pleadings, because of this admission of error, the petitioner stands before the Court, with respect to 1940, 1941, and 1942, in the same position as it did in 1939 and prior years, when it was on the installment basis, and the Commissioner stands here as if he had not made any change with respect to the method of reporting income. Insisting that the petitioner thus was on the installment basis at all times and that the peitioner used a method which fulfilled the underlying purpose of the installment method and had not at any time taken any action to obtain permission to change to any other basis, the respondent urges that the petitioner has no right under the statute or the regulations to include the $99,681.30 in its income of the year 1940.

While the respondent would now, on the strength of his admission of error, place the petitioner in the same position as if no change had ever been made in its method of reporting income, and thereby defeat the petitioner's claim for an adjustment under the accrual theory, yet, in his computations of proposed deficiencies for 1940, 1941, and 1942, submitted with his amended answer, the petitioner's income remains on the accrual basis, and its deductions for annual increases in the unrealized profit account, allowable under the installment method, are not allowed. In our opinion, the respondent's admission does nothing more than admit that he made a mistake. Whether his action was right or wrong, it does not alter the fact that the petitioner's method was changed. We therefore must reject the view that the petitioner was on the installment basis at all times and that such basis was never changed.

The regulation requiring consent of the Commissioner to a change in method does not limit the right to change to cases where the consent is given upon formal application of the taxpayer. The respondent's consent can be implied from his acceptance of a changed method of reporting, without rejection or other indication of his nonacquiescence. *Fowler Brothers & Cox, Inc.*, 47 B. T. A. 103, 109; affd., 138 Fed. (2d) 774; *S. Rossin & Sons, Inc.* v. *Commissioner*, 113 Fed. (2d) 652, reversing 40 B. T. A. 1274; *Home Ice Cream & Ice Co.*, 19 B. T. A. 762; *Ganahl Lumber Co.*, 21 B. T. A. 118. And where, as here, the change is directed by the Commissioner in the first instance, it can not be soundly argued that the taxpayer must secure formal permission to change in order to comply with the regulations. *Reynolds Cattle Co.*, 31 B. T. A. 206. Where the change is made from the installment to the straight accrual method, the regulation provides that the taxpayer "will be required" to return as additional income for the taxable year in which the change is made all the profit not theretofore re-

turned as income pertaining to payments due on installment sales contracts as of the close of the preceding year. This part of the regulation is mandatory in terms, and the necessity of returning such profit is present whether the change be made at the direction of the Commissioner or upon the application of the taxpayer.

We are of the opinion that the $99,681.30 should be included in the petitioner's income for the fiscal year ended January 31, 1940. There is no dispute between the parties as to other adjustments which result from our so holding respecting this item, and they should be made by the parties in the computations under Rule 50.

(2) *Accumulation of surplus.*—The respondent determined that the petitioner was availed of in the fiscal year January 31, 1941, for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its earnings or profits to accumulate instead of being divided or distributed, contrary to the prohibition of section 102 of the Internal Revenue Code, and he imposed the surtax levied by that section. If the earnings or profits were permitted to accumulate beyond the reasonable needs of the business, that fact must be considered as determinative of the purpose to avoid surtax upon the shareholders unless the petitioner by a clear preponderance of the evidence proves to the contrary. Sec. 102 (c).

The petitioner contends that its surplus was reasonably necessary for the current and future needs of its business, and that its purpose in paying the dividend after the taxable year was to return to its former policy of paying dividends after final audit of its books.

The petitioner's president, Noland Blass, corroborated by E. G. Watkins, an employee and director, testified that the accumulation was reasonably necessary for the conduct of the business. The reason assigned by Blass was that the tenure of the business premises was limited and the petitioner was faced with the possibility of constructing a new building on the premises in order to obtain a long term lease. The petitioner occupied the building on the premises under a lease which was extended in 1938 for a 10-year term, without any option of renewal, and the matter of obtaining a long term lease was discussed with the lessor from time to time. In 1945 various proposals were being considered, one of which involved the construction by the petitioner of a new building at a cost of about $750,000. The petitioner engaged an architect in 1945 to make a study of the matter. Noland Blass did not state what the other proposals were, or whether the petitioner had actually obligated itself by them to undertake construction of the new building. In so far as the situation existing in 1941 is concerned, his testimony is vague and indefinite and shows only that the petitioner was having difficulty in obtaining a long term lease.

An accumulation of earnings for the construction of new buildings

may be reasonable under certain conditions, *General Smelting Co.*, 4 T. C. 313, 323; but where, as here, nothing has been agreed upon and no definite action has been taken, and it further appears that the corporation in the taxable year had available funds sufficient to finance any proposed construction, there is no justification, on such grounds, for further accumulating earnings in the current year. As of January 31, 1941, the petitioner's surplus was $1,359,449.62. It had current assets of $1,469,516.04 and total liabilities other than capital of only $629,416.52. In the years prior to 1941 it had accumulated from past earnings investments in Federal and state and municipal bonds and corporate stocks, which were not necessary in the operation of its department store. Those investments amounted to $1,102,980.07 at January 31, 1940, and $1,140,004.70 at January 31, 1941. The latter amount was equal to 40·per cent of the entire assets. There is no proof that the bonds were not worth their face value; and, with respect to the corporate stocks carried on the books at $221,526.47, it is to be noted that, even if due allowance should be made for their decline in market value to $95,069.64 (but see *Helvering* v. *National Grocery Co.*, 304 U. S. 282), the petitioner's investments would still be about $1,000,000 and well over the requirements, if such existed, for new construction. In other words, even if the petitioner had a definite plan for new construction, it still could have distributed the earnings of the fiscal year ended January 31, 1941, without lessening its ability to finance a $750,000 project. The evidence, in our opinion, warrants the conclusion that the petitioner in the fiscal year ended January 31, 1941, had permitted its earnings and profits to accumulate beyond the reasonable needs of its business. *Whitney Chain & Mfg. Co.*, 3 T. C. 1109; affd., 149 Fed. (2d) 936; *Helvering* v. *National Grocery Co.*, *supra; Perry & Co.* v. *Commissioner*, 120 Fed. (2d) 123.

Our conclusion that in the fiscal year ended January 31, 1941, petitioner had permitted its earnings and profits to accumulate beyond the reasonable needs of its business establishes the presumption, under section 102 (c), that it was the purpose of petitioner to avoid surtax upon its shareholders for the year ended January 31, 1941. This presumption can, however, under further provisions of section 102 (c), be overcome by a clear preponderance of evidence to the contrary. The question is therefore narrowed to whether or not the earnings and profits of petitioner for the fiscal year ended January 31, 1941, were accumulated in that year with the purpose on the part of petitioner of preventing the imposition of surtax for that year on its shareholders. *Corporate Investment Co.*, 40 B. T. A. 1156, 1171; *General Smelting Co.*, *supra.*

The petitioner's directors at a meeting in January 1941 decided to revert to the former policy of postponing the payment of dividends

until after the receipt of the auditor's final report as to its earnings on the operations for the fiscal year ended January 31, 1941. The minutes of that meeting contain no record of such decision, but Noland Blass and E. G. Watkins testified that such decision was made, and Blass, corroborated by Watkins, testified that the reason for the change was as follows:

> At that time, we were advised that the necessity [of paying] dividends out of the earnings inside of the fiscal year in which they were made, had been eliminated by reason, I think, of repeal of the law or modification, or for some reason we did not have to do it according to the law. Under the circumstances, we preferred to go back to our previous method of paying dividends after we had received the actual information from our auditor's reports.

On March 12, 1941, after the close of the fiscal year ended January 31, 1941, and after receiving the final report from its auditor of its net earnings for that year, the petitioner declared a dividend of $239,690, and paid it on April 20, 1941; and, after the close of the next fiscal year, ended January 31, 1942, and, on February 12, 1942, after receiving the final report of its auditor, the petitioner declared a dividend of $239,690 and paid it on June 10, 1942. The April 20, 1941, dividend was approximately the same in amount as the petitioner's net profit of $240,134.70 for the fiscal year ended January 31, 1941; and the June 10, 1942, dividend was $12,485.33 less than the net profit of $252,175.33 for the fiscal year ended January 31, 1942. Ninety-four per cent of the dividend distributed by the petitioner on April 20, 1941, was made to stockholders who were on the calendar year basis and who reported the dividend as income received in the calendar year 1941, and the balance was distributed to other stockholders who are not shown to be on the calendar year basis, but who reported their dividends as income and paid the tax thereon. The petitioner contends that it had no reason to believe that deferring the payment to April 1941 would effect a reduction in the surtax on its stockholders. The respondent argues that, by virtue of section 115 (a) of the Internal Revenue Code,[2] the two distributions mentioned must be considered as having been made respectively out of the earnings of the fiscal years ended January 31, 1942 and 1943; that the petitioner thus skipped a dividend in the fiscal year ended January 31, 1941, and thereby increased its surplus by the amount undistributed, and, if it had desired to change its policy, it could and should have paid another dividend before the end of the fiscal year January 31, 1942. His position is that, while the stockholders, on the calendar year basis, reported

---

2 * * * The term "dividend" when used in this chapter * * * means any distribution made by a corporation to its shareholders, * * * out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.

*      *      *      *      *      *      *

their shares of the April 20, 1941, dividend in their returns for 1941, the dividend was a dividend for the fiscal year ended January 31, 1942, and they never received a dividend for the fiscal year ended January 31, 1941, and hence the surtax on the unpaid dividend for the latter year was avoided by them.

The fact that the $239,690 distribution was not made until April 20, 1941, and that, consequently, under section 115, must be deemed as having been made from petitioner's net earnings for the fiscal year ended January 31, 1942, rather than from such earnings for the fiscal year ended January 31, 1941, and that consequently, as argued by respondent, there was no distribution of petitioner's net earnings in the fiscal year ended January 31, 1941, is not determinative of the question involved; since, even if there was no distribution in the fiscal year ended January 31, 1941, of petitioner's net earnings for that year, it still would not be liable for the tax under section 102 if during that fiscal year petitioner had no intention of preventing the imposition of surtax on its stockholders by failing to distribute any of its net earnings for that year. *Cecil B. DeMille*, 31 B. T. A. 1161, 1174; affd., 90 Fed. (2d) 12; *Corporate Investment Co., supra; Almours Securities, Inc.*, 35 B. T. A. 61, 69; affd., 91 Fed. (2d) 427; certiorari denied, 302 U. S. 765; *R. L. Blaffer & Co.*, 37 B. T. A. 851, 856; affd., 103 Fed. (2d) 487; certiorari denied, 308 U. S. 635. That petitioner had no such intention is, we think, demonstrated by the facts: (a) That petitioner awaited the final report of its auditor made after the end of the fiscal year, in order to definitely ascertain its net profits for that year; (b) that the distribution made in April 1941 was in the identical amount, less $444.70 of its net earnings for its fiscal year ended January 31, 1941; and (c) that such distribution was included in the income of petitioner's stockholders for the calendar year 1941, just as would have been the case had the distributions been received by the stockholders at any time in January 1941 during the fiscal year of petitioner ending on January 31, 1941. In a case where it appeared that the distribution of all of the year's earnings, if it had been made, would have resulted in a very nominal surtax on the shareholders, such fact was held to be sufficient to refute any purpose of avoidance. *Charleston Lumber Co.* v. *United States*, 20 Fed. Supp. 83; appeal dismissed, 93 Fed. (2d) 1018. Here, the distribution of the year's earnings was made and the tax was not avoided, but was paid by the distributees; and the claim that there was a purpose of avoidance must be rejected.

The respondent, in the face of the proof that there was no avoidance of the surtax on the stockholders, has undertaken to show avoidance by the stockholders Jesse Heiman and Camille Thalheimer, and he relies upon the rule that the statute does not require that surtax be avoided by all of the stockholders. *Trico Products Corporation*, 46

B. T. A. 346, 382; affd., 137 Fed. (2d) 424. This position of respondent is untenable. On January 31, 1941, Jesse Heiman and Camille Thalheimer transferred a part of their stock to members of their families in trust and the trustees received dividends on that stock in the distribution of April 20, 1941, and paid the tax thereon. The evidence shows that in the case of each of the two stockholders, his or her income tax liability for 1941, computed by including in his or her income the dividends received by the trusts and deducting the income tax of the trusts attributable to such dividends, was greater than the income tax assessed against him or her on his return for 1941.

The evidence clearly shows that the petitioner had no purpose and intention of preventing the imposition of surtax on Jesse Heiman and Camille Thalheimer with respect to distributions on the stock conveyed by them to the trusts. The reason that these two stockholders did not in their taxable calendar year 1941 and on April 20 of that year receive dividends on the stock transferred to the trusts, as did the other stockholders on their stock, was solely because of their transfers of such stock to the trusts. In this connection, it is shown by the evidence that the president of petitioner knew nothing of the trusts until new stock certificates for the trustee-transferees were presented to him on January 31, the date of execution of the trusts for his signature as an officer of the corporation, and that the trusts had not been mentioned to or discussed by any of the directors prior to that date. The transfers to the trusts were, in our opinion, the sole acts of Jesse Heiman and Camille Thalheimer, made without any prior understanding with petitioner or its officers. If Jesse Heiman and Camille Thalheimer escaped surtax, it was not due to any act or intention of the corporation, its officers, or directors, and we see no reason for imputing to the corporation an intention to accomplish that result. *Trico Products Corporation, supra,* therefore does not apply.

In our opinion the petitioner has overcome the presumption of section 102 (c), and we therefore hold that the petitioner was not availed of in the fiscal year ended January 31, 1941, for the purpose proscribed by section 102 (a). The imposition of the tax on the petitioner under section 102 is disapproved.

(3) *Salaries of officers.*—The petitioner in computing its net income for the fiscal year ended January 31, 1942, deducted salaries paid to Noland Blass, Jesse Heiman, and Hugo Heiman in the amounts of $53,500, $16,000, and $15,000, respectively. The respondent held all three salaries to be excessive in part and allowed deductions in the amounts of $42,000, $7,000, and $8,166.66, respectively. In his brief he concedes that the evidence establishes that $10,000 is a reasonable allowance for services of Jesse Heiman and for services of Hugo Heiman. The question now is whether the petitioner is entitled to

deduct the additional amounts of $11,500 in the case of Noland Blass, and $6,000 and $5,000, respectively, in the cases of Jesse Heiman and Hugo Heiman.

*Noland Blass.*—We think that the amount of $42,000 constitutes reasonable compensation for the services rendered by Noland Blass. The record shows that he was well qualified to manage the petitioner's business and that, in addition to assuming the responsibilities and duties as president and chief executive officer, he devoted a large part of his time to the performance of a varied amount of managerial work. The merchandising of the entire store, including the main departments and the downstairs store, was handled by him without the aid of divisional merchandise managers customarily employed in such operations; he served as publicity director; and he supervised both divisions of the store management department, which embraced the store maintenance and operational services and the clerical and bookkeeping work. The only managerial work which did not come under his direct supervision was that relating to finance and credit, which was handled by Jesse Heiman. Under the management of Noland Blass, and during the years 1940, 1941, and 1942, the petitioner earned a net profit in each year, before taxes, of over 11 per cent of its gross sales, and in 1942 the petitioner's net profit, before taxes, was 15 per cent higher than in 1941. The salary of $53,500 was not measured by any percentage of earnings or increase in earnings, nor was it fixed under any agreement to pay on that basis. Noland Blass was in full control of the corporation and merely fixed his own salary at what he thought his services were worth, and the other directors acquiesced. It is upon the multiplicity of services performed by him and the earning record of the company that the petitioner rests its claim of reasonableness of the salary paid.

There can be no doubt that Noland Blass' services were more than ordinarily are assigned to a single individual in a department store and were of substantial value to the petitioner; but, when all the facts and circumstances are fairly considered, an allowance of $53,500 as his salary nevertheless seems excessive. In the years 1940 and 1941 the salary paid Noland Blass was $36,000, and, so far as the evidence shows, there was no difference whatever between the character and amount of such services in those years and in the taxable year 1942. The gross sales in 1942 were $618,000 greater than in 1941, but, if such increased sales involved an added burden to the duties of Noland Blass and if the increase of 15 per cent in the profits in 1942 should be regarded as attributable solely to his personal services, an increase in salary of $17,500, or 50 per cent, seems entirely unwarranted.

Furthermore, the salary of $53,500 seems unreasonably high when considered in connection with the situation in the stores of the Strip-

ling Co. and Stix, Baer & Fuller Co. The Stripling store is comparable with that of the petitioner in that both stores had the same amount of capital and the same volume of business in 1942—the capital and surplus of each being about $2,000,000 and the gross sales amounting to about $3,000,000. Stripling paid $18,000 to its president and $10,000 to each of its two other executives. Those officers performed all of the supervisory and managerial work, except the merchandising and publicity. The company employed three merchandise managers and a publicity director, the latter being paid $300 per month. Its earnings in 1942, before deducting income tax, were 80 per cent higher than in 1941. The Stix, Baer & Fuller store was decidedly larger than the petitioner's store, its capital being $6,000,000 and its sales volume $18,000,000 in 1942. Its earnings in 1942 were 90 per cent higher than those of 1941. Its top executives received salaries of $32,000. They supervised the various departments, but the merchandising and publicity work were actively carried on by numerous employees at salaries ranging from $18,000 to $33,000.

There are such variations in the portion of the department store management assumed by each of the above officers of both Stripling and Stix, Baer & Fuller, as compared with the duties performed by Noland Blass, that the salary paid to any one of them can not be laid down as a yardstick to measure precisely the value of Noland Blass' services; but it is to be noted that the salary of $42,000 allowed by the respondent for Noland Blass exceeds the total salaries paid by the Stripling Co. to its three executive officers and is $10,000 more than the top salary paid to any of the officers or managers by Stix, Baer & Fuller, which did six times as much business as the petitioner. Even if the services of Noland Blass were wider in scope than those of any one of such officers, the respondent's allowance seems adequate. We therefore approve the determination of the respondent in allowing the deduction to the extent of $42,000.

*Jesse Heiman.*—The duties of Jesse Heiman, in addition to those performed as vice president and treasurer, consisted of running the finance and credit department. His duties were substantially the same in scope as those performed by J. C. Griffith of the Stripling Co. That company paid Griffith $10,188.63 for the year 1942, and we agree with the respondent, who concedes that $10,000 is a reasonable allowance for the services of Jesse Heiman for that year.

*Hugo Heiman.*—Hugo Heiman served as a buyer for the furniture department, supervised the warehouse, and represented the company in trade and civic affairs. His responsibilities and duties were less extensive than those of Jesse Heiman, but, in view of the respondent's concession, we hold that $10,000 is a reasonable allowance for his services for the year 1942.

It is true that a witness relied upon by petitioner as an expert testified that the salaries paid Noland Blass, Jesse Heiman, and Hugo Heiman were reasonable, but in view of the showing made as to his qualifications and in further view of other facts of record which enable us to decide for ourselves the reasonableness or unreasonableness of such salaries, we can not adopt the opinion of this witness on the question of reasonableness of the salaries.

(4) *Relief under section 722.*—The petitioner has assigned error in the denial by respondent of its claim for relief under section 722 of the Internal Revenue Code. Under this assignment of error it alleges in its petition that its base period earnings should be adjusted (a) by increasing the income of the fiscal year ended January 31, 1940, by the item of $99,681.30 involved in issue (1), *supra*; and (b) by restoring to the income of the fiscal year ended January 31, 1939, a loss of $7,037.59 sustained in connection with a lease of its shoe department. In making his opening statement the petitioner's counsel withdrew this issue in so far as it was based on the item of $99,681.30, and stated that the petitioner sought adjustment on account of the shoe loss under section 722 and, in the alternative, under section 711. The respondent opposed consideration of section 711 on the ground that no issue under that section had been raised by the pleadings. The petitioner did not apply for leave to amend its pleadings to assert an adjustment under section 711.

In its brief the petitioner directs its argument principally to the applicability of section 711, but, on the record before us, we are unable to consider an adjustment claimed under that section. In presenting a claim for relief under section 722, a taxpayer using the excess profits credit based on income must show that its average base period net income is an inadequate standard of normal earnings because of the existence of one or more factors described in subdivisions (1) to (5) of section 722 (b). *Lamar Creamery Co.*, 8 T. C. 928. And, if the taxpayer in his claim before the Commissioner relies only upon the existence of the factors described in one of such subdivisions, this Court will not consider a contention based on factors described in one or the other of such subdivisions. *East Texas Motor Freight Lines*, 7 T. C. 579, 588; *Monarch Cap Screw & Manufacturing Co.*, 5 T. C. 1220, 1229. Cf. *Blum Folding Paper Box Co.*, 4 T. C. 795. It is therefore obvious that, upon a review of the Commissioner's final determination on a claim for relief under section 722, this Court may not look beyond section 722 and apply some other section of the statute, such as 711.

The petitioner contends that it is entitled to relief under subdivision 4 of section 722 (b). With regard to the contents of the application for relief filed with respondent and the supporting facts, the record shows only that petitioner filed with the respondent an

application for relief under section 722, which respondent denied. The record does not show what facts, if any, were presented to the respondent in the application, or otherwise, in support of that application. Petitioner's claim for relief under section 722 is therefore not properly before us. *East Texas Motor Freight Lines, supra; Monarch Cap Screw & Manufacturing Co., supra;* and *Blum Folding Paper Box Co., supra.*

(5) *Deduction of payments for employees' bonus.*—The respondent, in his amended answer, alleges that he erroneously allowed the petitioner to deduct $41,854.17, which deduction was claimed on the petitioner's return for the fiscal year ended January 31, 1942, as an amount set aside under an agreement for the payment of bonuses during the fiscal year ended January 31, 1943. He contends that the amount is not a proper accrual for the fiscal year ended January 31, 1942, since the right of the employee to the bonus was contingent upon his remaining in the service of the petitioner during the following fiscal year. He cites as authority the cases of *Horn & Hardart Baking Co.,* 19 B. T. A. 704; 20 B. T. A. 486; *Western States Envelope Co.,* 10 B. T. A. 856; and *Commercial Electrical Supply Co.,* 8 B. T. A. 986. The cases cited by respondent are distinguished in that in those cases the funds payable to the taxpayer's employees contingent upon their remaining in the employ of the taxpayer were retained by the taxpayer in reserve accounts and the portions of the funds which would otherwise go to employees except for their failure to remain the prescribed time in the employ of the taxpayer would upon such failure be retained by the taxpayer. This is not true here, since under the provisions of the trust instrument none of the funds agreed to be paid the trustee for the benefit of petitioner's employees could ever be returned to or received by it.

We think the present case is controlled by the decision in *Oxford Institute,* 33 B. T. A. 1136. There the taxpayer made payments of stated amounts every month to trustees for the account of each employee, under a contract and trust agreement providing for payment of the amount accumulated for the account of each employee as a bonus at the end of ten years, provided he remained in the employ of the taxpayer. The taxpayer was on the cash basis, and for the year 1932 it claimed deductions for the amounts paid over in that year to the trustee for future distribution under the agreement. The Board of Tax Appeals held that the payments were deductible as "expenses paid" during 1932. The rationale of the decision is that the money was paid out by the taxpayer as required by an irrevocable trust and was put beyond its control, and that the fact that it was subject to be paid back to the taxpayer upon the happening of contingencies within the control of the employees does not change the character of

the payments as present expenses. And this Court has held, under circumstances similar to those here, that an amount which is not merely the subject of an accounting reserve, but which is actually paid in the taxable year to a trust under terms which require that it be held for the employees, and which thoroughly prevents its ever going back to the employer, is deductible. *Gisholt Machine Co.*, 4 T. C. 699, 706. Under the agreement of January 8, 1942, here involved the fund in the hands of the trustees was as effectively placed beyond the control of the petitioner as was the fund involved in the *Oxford* case. The agreement not only states that the fund is for the sole and exclusive benefit of the employees, without any right of reverter in the petitioner, but also, with respect to employees who might forfeit their rights therein by leaving the employment, it provides that the shares allotted to them shall be distributed among the remaining employees. The liability of petitioner for the $41,854.17 became fixed and definite at the time when the agreement was made and that amount was paid over to the trustees, which was on January 8, 1942. The fact that the taxpayer in the *Oxford* case was on the cash basis, while the petitioner in this case is on the accrual basis, does not require a different conclusion from that reached in the *Oxford* case.

We are of the opinion that the amount of $41,854.17 accrued as a liability in the fiscal year ended January 31, 1942, and hold that it is a proper deduction in computing the net income of that year. No contention is made that the amount is not an ordinary and necessary business expense.

(6) *Excess profits net income—Contributions.*—In computing income tax liability for the fiscal year ended January 31, 1941, the petitioner deducted $19,006.78 for corporate charitable contributions under section 23 (q) of the Internal Revenue Code. That amount was based upon 5 per cent of the net income before deduction for such contributions. In determining the deficiencies, $19,006.78 was allowed as a deduction not only in computing the net income for income tax purposes, but also in computing the excess profits net income. The respondent, however, in his amended answer, alleges that, for excess profits tax purposes, the deduction should be computed on the basis of 5 per cent of the excess profits net income computed under section 711 (a) (1) of the Internal Revenue Code, before deduction of the charitable contributions. Such computation will reduce the deduction for contributions to $13,438.03, and the respondent contends that the excess profits net income is understated by the difference between that amount and $19,006.78, or $5,568.75. The petitioner contends that there is no authority in the statute for the method of computation proposed by the respondent.

The taxable year involved is the petitioner's fiscal year beginning on February 1, 1940, and ending on January 31, 1941. The applicable

statute is Title II of the Second Revenue Act of 1940, approved October 8, 1940, which added the excess profits tax provisions to the Internal Revenue Code as sections 710 et seq. Section 710 (a) imposes, for each taxable year beginning after December 31, 1939, a tax on the "adjusted excess profits net income" of every corporation. That "adjusted excess profits net income" is defined in section 710 (b) as the excess profits net income (as defined in section 711) minus a specific exemption and certain credits. Section 711 is in part as follows:

SEC. 711. EXCESS PROFITS NET INCOME.

(a) TAXABLE YEARS BEGINNING AFTER DECEMBER 31, 1939.—The excess profits net income for any taxable year beginning after December 31, 1939, shall be the normal-tax net income, as defined in section 13 (a) (2), for such year except that the following adjustments shall be made:

(1) EXCESS PROFITS CREDIT COMPUTED UNDER INCOME CREDIT.—If the excess profits credit is computed under section 713, the adjustments shall be as follows:

None of the adjustments referred to in section 711 (a), those adjustments being set out in subdivisions (A) to (F) of section 711 (a) (1), requires a change in the basis of deductions for contributions, since none treats of contributions.

We find no authority in the language of section 711 (a) (1) for computing the petitioner's excess profits net income in the manner contended for by the respondent. The term "normal tax net income" mentioned in section 711 (a) is the normal tax net income "as defined in section 13 (a) (2)" of the Internal Revenue Code, and such normal tax net income is the basis of the income tax imposed on corporations by chapter 1 of the code. That Congress intended the normal tax net income for the purpose of section 711 to be the same as the normal tax net income for the purpose of computing the corporation income tax is evident not only from the use in section 711 of the qualifying words, "as defined in section 13 (a) (2)," but it is made doubly clear by section 728 of the code (added by the Second Revenue Act of 1940), which states that "the terms used in this subchapter shall have the same meaning as when used in Chapter 1" (that is, the chapter imposing the income tax). Looking to chapter 1, we find all of the provisions necessary to the determination of the normal tax net income of the corporation. Thus, under section 21, the net income is "the gross income computed under section 22 less the deductions allowed by section 23"; under section 13 (a) (1), the adjusted net income is "the net income minus the credit provided in section 26 (a) relating to interest on obligations of the United States," etc.; and under section 13 (a) (2), the normal tax net income is "the adjusted net income minus the credit for dividends received provided in section 26 (b)." In computing the net income, the corporation is allowed, under section 23 (q), to deduct "contributions * * * to an amount which does not exceed 5 per centum of the taxpayer's net income as computed

without the benefit of this subsection." If Congress had intended that, for the purposes of computing excess profits tax, the deduction under section 23 (q) should be limited by 5 per centum of the net income computed in a manner other than that provided for income tax purposes, it could have so provided in appropriate language when specifying the adjustments to be made to the normal tax net income for computation of excess profits net income; and, as above stated, the only adjustments specified are those in paragraphs (A) to (F) in section 711 (a) (1), none of which requires a change in the basis of deductions for contributions.

We think the computation proposed by the respondent in his amended answer is contrary to the plain and unambiguous terms of the statute, and it is disapproved.

Reviewed as to section 722 by the Special Division.

Reviewed by the Court, except as to issue 4.

*Decision will be entered under Rule 50.*