LANGLEY PARK APARTMENTS, SEC. C, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5410–63. Filed June 25, 1965.

---

*Werner Strupp*, for the petitioner.
*Herbert A. Seidman*, for the respondent.

MULRONEY, *Judge:* Respondent determined deficiencies in petitioner's corporate income tax for the fiscal years ended April 30, 1960, 1961, and 1962, in the respective amounts of $2,158.57, $4,043.97, and $4,560.11.

The sole issue is the reasonableness of salaries paid to officers and claimed as deductions for the above years and for the year ended April 30, 1957, which latter year is involved because of a net operating loss carry-forward affecting the years in issue.

FINDINGS OF FACT

Some of the facts have been stipulated and they are found accordingly.

Petitioner, Langley Park Apartments, Sec. C, Inc., is a Maryland corporation that owns an apartment building located at Merrimac Drive and New Hampshire Avenue, in Prince Georges County, Md. Petitioner's apartment building contains 68 one-bedroom apartments and 66 two-bedroom apartments. It is actually 1 section of a 10-section apartment complex which contains in all 1,520 apartments. All of the sections were built at the same time and they are identical in construction and rent for the same rent but the sections are owned by various persons.

Petitioner filed its income tax returns for the fiscal years herein involved with the district director of internal revenue, in Baltimore, Md. Jamshed Vesugar and his wife Estelle Reid Vesugar acquired all of petitioner's common stock (400 shares) as of August 1951 at a cost of $107,200. Thereafter until August 17, 1959, Jamshed Vesugar owned 300 shares and Estelle 100 shares of said stock. After August 17, 1959, they each owned 200 shares of said common stock.

During the fiscal years ended April 30, 1952, to April 30, 1962, inclusive, Jamshed Vesugar was a member of the petitioner's board of directors and also its president. During the fiscal years ended April 30, 1952, to April 30, 1962, inclusive, Estelle Reid Vesugar was a member of the petitioner's board of directors and held the office of vice president and treasurer. On April 20, 1960, Estelle Reid Vesugar

was elected as assistant secretary of the petitioner and held that office for the remainder of the taxable periods involved.

Petitioner's apartment property has at all times been subject to a Federal Housing Administration insured mortgage. When the Federal Housing Administration, hereinafter referred to as FHA, participates in the financing of an apartment project such as petitioner's, it establishes the maximum rentals per apartment which the mortgagor-owners may charge. The mortgagor-owner is prohibited by the FHA from charging apartment rents in excess of the established apartment rent. If a mortgagor-owner desires to increase the apartment rentals authorized by the FHA, he must first apply for and then obtain from the FHA a rent increase authorization. Any applications for rent increase had to be filed in conjunction with the applications of the other section owners. Three of petitioner's applications for rent increase for its apartments were granted by FHA between 1956 and 1961.

During the fiscal years ended April 30, 1951, to April 30, 1962, inclusive, petitioner employed a Washington, D.C., real estate brokerage and management firm to lease its apartments, collect rents, and, in general, to manage its apartment building. An officer of this firm executes all the leases in connection with petitioner's apartments, and all the executed leases are kept at the firm's office in Washington. This management firm hired two janitors for petitioner's property. One janitor occupied an apartment on the premises rent free and the other lived elsewhere and worked there each day. The management firm paid the janitors' salaries. There is also a management office maintained on the premises for petitioner's section and the three other sections controlled by the same management firm. This office is staffed by a resident manager and an assistant manager hired by the management firm. The resident manager and assistant manager largely supervised the janitors and repair work and aided in showing and renting apartments. An employee of the management firm visits the apartment building each day and checks with the resident manager and sees to needed maintenance and orders needed supplies which are all paid for by the management firm. Any repairs of $50 or less would be handled without consulting the owners. Each month the management firm would send the owners a statement showing the rents collected, the various expenditures for supplies, and operation, including the salaries of the janitors and the pro rata share (with the other three sections) of the salaries of the resident manager and assistant manager and the pro rata share of the resident manager's office. The firm would deduct from the rents collected all of the operating expenses and its fee of 3 percent of the gross rents and its check for the difference would accompany the monthly statement. The management firm also

prepared some of the reports required by the FHA from the petitioner, prepared and filed petitioner's applications for rent increases with the FHA, prepared petitioner's Federal payroll tax returns, and prepared petitioner's State workmen's compensation reports. For its services during the fiscal years ended April 30, 1957, to April 30, 1962, inclusive, the firm was paid the said 3 percent of gross rentals which, during the years in question, were paid amounts ranging from $3,676.54 in 1957 up to $4,079.80 in 1962.

During the fiscal years ended April 30, 1951, to April 30, 1962, inclusive, petitioner employed an independent accounting firm to prepare all of its financial statements, tax returns, and to maintain its financial records and books of account. In addition, the accounting firm prepared annual financial reports which were filed with the FHA. For its services during the fiscal years ended April 30, 1957, to April 30, 1962, inclusive, the independent accounting firm was paid $600 for the year 1958 and $400 for the years 1957, 1959, and 1960, and $500 for the years 1961 and 1962.

During the fiscal years ended April 30, 1951, to April 30, 1962, inclusive, the petitioner maintained only a single checking account in the Munsey Trust Co. The only checks drawn by petitioner on this account were for the payment of officers' salaries and withdrawals, accounting fees, legal fees, State and Federal taxes and fees, and corporate distributions to shareholders.

Shortly after the Vesugars acquired petitioner's stock in 1951, a special meeting of the corporation directors was held at which the salary of its president Jamshed Vesugar, was fixed at the rate of $12,000 annually and that of the vice president and treasurer (Estelle Vesugar) at $4,800. Actually, during the fiscal years ending April 30, 1952, through April 30, 1962, the petitioner did not determine the actual compensation payable to its officers for the fiscal year until the end of each fiscal year.

Beginning with the year ended April 30, 1955, petitioner's officers began making withdrawals from petitioner, which withdrawals were generally charged to a loan account. At the end of the fiscal year, when petitioner's income was known, the loan account would usually be closed out and balancing charges would be made to the officers' salary account and to the surplus account. The amount closed to the surplus account would then usually be declared as a dividend even though in all but 2 years (1958 and 1960) the dividends were not paid out of current or accumulated earnings and profits.

The following is a portion of the stipulation of facts which begins with paragraph numbered 14 and ends with paragraph numbered 21, which illustrates the method by which the officers' salaries were fixed

and handled for the years 1955 through 1962 as disclosed by petitioner's books and records:

14. During the fiscal year ended April 30, 1955 Jamshed Vesugar withdrew cash totaling $4300 from the petitioner, which withdrawals were designated as "loans" on the petitioner's books of account. The withdrawals by Jamshed Vesugar were noninterest bearing, unsecured and not evidenced by notes or other instruments of indebtedness. At the close of the fiscal year ended April 30, 1955 the "loan account" balance of $4300 was reduced to zero by charging $3700 to the surplus account and $600 to the officers' salary account.

The petitioner's board of directors at a special meeting on October 8, 1954 declared a dividend on common stock in the amount of $2400. The petitioner's board of directors at its annual meeting on April 20, 1955 declared a dividend on common stock in the amount of $3700. The $3700 transfer from the "loan account" to the "surplus account" was the basis for the $3700 dividend. Thus, it was not necessary to transfer any cash to Jamshed and Estelle Vesugar at the time of the dividend declaration of $3700.

The total dividends of $6100 for the fiscal year ended April 30, 1955 were not, according to petitioner's books of account, paid out of current earnings and profits or out of accumulated earnings and profits of the petitioner.

15. During the fiscal year ended April 30, 1956 Jamshed Vesugar withdrew cash totaling $4000 from the petitioner, which withdrawals were designated as "loans" on petitioner's books of account. The withdrawals by Jamshed Vesugar were noninterest bearing, unsecured and not evidenced by notes or other instruments of indebtedness. At the close of the fiscal year ended April 30, 1956 the "loan account" balance of $4000 was reduced to zero by charging $2300 to the surplus account and $1700 to the officers' salary account.

The petitioner's board of directors at its annual meeting on April 18, 1956 declared a dividend on common stock in the amount of $2300. The transfer from the loan account was the basis for the $2300 dividend. Thus, it was ˙˙ot necessary to transfer any cash to Jamshed and Estelle Vesugar at the time of the dividend declaration.

The dividend of $2300 for the fiscal year ended April 30, 1956 was not according to petitioner's books of account, paid out of current earnings and profits or out of accumulated earnings and profits of the petitioner.

16. During the fiscal year ended April 30, 1957 Jamshed Vesugar withdrew cash totaling $400 from the petitioner, which withdrawals were designated as "loans" on petitioner's books of account. The withdrawals by Jamshed Vesugar were noninterest bearing, unsecured and not evidenced by notes or other instruments of indebtedness. Near the close of the fiscal year ended April 30, 1957 the "loan account" balance of $400 was reduced to zero by charging $400 to the surplus account.

The petitioner's stockholders at their annual meeting on April 17, 1957 declared a dividend on common stock in the amount of $400. The $400 transfer from the loan account was the basis for the $400 dividend. Thus, it was not necessary to transfer any cash to Jamshed and Estelle Vesugar at the time of the dividend declaration.

The dividend of $400 for the fiscal year ended April 30, 1957 was not according to petitioner's books of account paid out of current earnings and profits or out of accumulated earnings and profits of the petitioner.

17. During the fiscal year ended April 30, 1958 Jamshed Vesugar withdrew cash totaling $4000 from petitioner which withdrawals were designated as "loans" on petitioner's books of account. The withdrawals by Jamshed Vesugar

were noninterest bearing, unsecured and not evidenced by notes or other instruments of indebtedness. At the close of the fiscal year ended April 30, 1958 the "loan account" balance of $4000 was reduced to zero by charging $4000 to the surplus account.

The petitioner's board of directors at their annual meeting on April 16, 1958 declared a dividend on common stock in the amount of $4000. The $4000 transfer from the loan account was the basis for the $4000 dividend. Thus, it was not necessary to transfer any cash to Jamshed and Estelle Vesugar at the time of the dividend declaration.

As of the close of the fiscal year ended April 30, 1958 the petitioner's books of account disclosed that petitioner had no accumulated earnings and profits. The petitioner's income tax return for the fiscal year ended April 30, 1958 reported current earnings of $873.07.

18. During the fiscal year ended April 30, 1959 Jamshed Vesugar withdrew cash totaling $9190 and Estelle Vesugar withdrew cash totaling $2500 from petitioner. These withdrawals were designated as "loans" on petitioner's books of account. The withdrawals by Jamshed and Estelle Vesugar were noninterest bearing, unsecured and not evidenced by notes or other instruments of indebtedness. The withdrawals remained on the corporate books of account as loans at the close of the fiscal year ended April 30, 1959.

The board of directors of petitioner declared no dividend on common stock for the fiscal year ended April 30, 1959.

19. During the fiscal year ended April 30, 1960 Jamshed Vesugar withdrew cash totaling $8310 and Estelle Vesugar withdrew cash totaling $300 from the petitioner. These withdrawals by Jamshed and Estelle Vesugar were designated as "loans" on petitioner's books of account. The withdrawals were noninterest bearing, unsecured and not evidenced by notes or other instruments of indebtedness. At the close of the fiscal year ended April 30, 1960 the loan account balance of $20,300 ($11,690 balance from fiscal year 1959 plus $8610 balance from current year) was reduced to zero by charging $20,300 to the surplus account.

The petitioner's board of directors at their annual meeting on April 20, 1960 declared a dividend on common stock in the amount of $20,300. The $20,300 transfer from the loan account was the basis for the $20,300 dividend. Thus, it was not necessary to transfer any cash to Jamshed and Estelle Vesugar at the time of the dividend declaration. The petitioner's income tax return for the fiscal year ended April 30, 1960 reported earnings for the year of $895.23.

20. During the fiscal year ended April 30, 1961 Jamshed Vesugar withdrew cash totaling $15,200. Of the amounts withdrawn, $11,000 was charged to the loan account of Jamshed Vesugar and $4200 was charged to the Jamshed Vesugar salary account. The amounts withdrawn and charged to the loan account were not evidenced by notes or other instruments of indebtedness, were unsecured and noninterest bearing.

On April 30, 1961 entries were made on petitioner's books of account which reduced Jamshed Vesugar's loan account balance by $9920. Correspondingly, the officers' salary account of Jamshed Vesugar was increased by $3600 and the officers' salary account of Estelle Vesugar was increased by $6320. The entries were made pursuant to instructions of petitioner's board of directors.

Since the reduction in Jamshed and Estelle Vesugar's loan account was the basis for the salary account entries, no cash was received from petitioner by Jamshed and Estelle Vesugar at the time of these entries. The $15,200 withdrawn during the fiscal year ended April 30, 1961 was obtained by checks drawn on petitioner's checking account and made payable to Jamshed Vesugar.

21. During the fiscal year ended April 30, 1962 Jamshed Vesugar withdrew cash totaling $15,000 from petitioner, all of which was charged to the officers' salary account. The amounts withdrawn were obtained by checks drawn on petitioner's checking account and made payable to Jamshed Vesugar.

The minutes of the annual meeting of the stockholders held on April 17, 1957, contain the following paragraph:

After considerable discussion, it was duly moved, seconded and approved that the salary for Estelle Reid Vesugar as Vice-President and Treasurer of this Corporation be discontinued beginning January 1, 1957 until further notice. Such unpaid salary to be ultimately paid when the financial condition of the Corporation justifies such disbursement.

The minutes of the annual meeting of the stockholders held on April 20, 1960, contain the following paragraph:

Discussion was had concerning the salary of Estelle Reid Vesugar, which had been discontinued by action of the Board in 1957. Upon motion being duly made, seconded and passed the Board re-established this salary for the coming fiscal year of the corporation at the rate of $4,800.00 per annum, subject to the ability of the corporation to meet this committment [sic].

The minutes of the annual meeting of the stockholders held on April 19, 1961, show that a possible distribution to the shareholders was discussed and tabled and the minutes contain the following paragraph:

Discussion was had concerning the advances that had been made to the principal corporate officers during the fiscal year and it was the consensus of the Board that the corporation's accountants be instructed to convert the following amounts from the advance account to the Officers' Salary account:

$9,920.00, applied as follows: to Estelle Reid Vesugar $4,800.00 for the current fiscal year, plus $1,520.00 unpaid balance due her on her salary for the fiscal year ended April 30, 1953; and to Jamshed Vesugar $3,600.00 for the current year, which would then bring his total salary for this fiscal year to $7,800.00.

The minutes of the stockholders' meeting of April 18, 1962, again show a possible distribution to the shareholders was discussed and tabled. On the back of these minutes there appears the following:

Paragraph omitted in error.

The President's salary was continued at the authorized amount of $12,000.00 per annum, and by motion being duly made, seconded and approved, it was; resolved that $3,000.00 of unpaid salary, due the President, from previous fiscal years (during which the salary had not been paid in full) be paid.

(Signed) E. R. V.

On its returns for the fiscal years ended April 30, 1957, April 30, 1960, April 30, 1961, and April 30, 1962, the petitioner claimed deductions for officers' salaries as follows:

| FYE Apr. 30— | Jamshed Vesugar | Estelle Vesugar |
|---|---|---|
| 1957 | $8,200 | 0 |
| 1960 | 7,800 | 0 |
| 1961 | 7,800 | $6,320 |
| 1962 | 8,680 | 6,320 |

The respondent in his notice of deficiency made the following adjustments with respect to the deductions claimed by petitioner for compensation paid to its officers:

| FYE Apr. 30— | Deductions | | | |
|---|---|---|---|---|
| | Jamshed Vesugar | | Estelle Vesugar | |
| | Allowed | Disallowed | Allowed | Disallowed |
| 1957 | $1,500 | $6,700 | No deduction claimed | |
| 1960 | 1,500 | 6,300 | No deduction claimed | |
| 1961 | 1,500 | 6,300 | 0 | $6,329 |
| 1962 | 1,500 | 7,180 | 0 | 6,320 |

The petitioner has at no time deducted withholding taxes and except for the years 1952 and 1953 has at no time deducted Federal Insurance Contributions Act taxes from the amounts it paid to its officers and listed on its tax returns as officers' salaries.

Beginning in the early part of 1957 and until sometime in 1958 Jamshed Vesugar worked on a full-time basis for the World Bank. Beginning in December of 1958 Jamshed Vesugar was employed as a registered representative for a Washington stock brokerage firm.

OPINION

Both parties agree this case involves the single issue of the reasonableness of the compensation paid to the officers and claimed as deductions under section 162(a)(1), I.R.C. 1954. The cited statute allows deductions for business expenses "including * * * a reasonable allowance for salaries or other compensation for personal services actually rendered." What constitutes reasonable salary or compensation for each corporate officer is a question of fact. Respondent's determination is prima facie correct and petitioner has the burden of proving that it is entitled to a deduction in an amount larger than the amount allowed by respondent. *Geiger & Peters, Inc.*, 27 T.C. 911.

We are convinced from a study of the entire record in this case that the compensation paid to each of the officers of petitioner was excessive. This corporation was officer owned and the evidence shows the method employed by petitioner for compensating its officers had no substantial relation to the type and extent of services the officers performed for the corporation. Ordinarily the salaried officer of a corporation draws a fixed amount of pay weekly or monthly which is charged to a compensation account on the books, with a possible end-of-the-year bonus. Here the officers made withdrawals during the year which were charged to what was termed "each officer's loan account," and at the end of the year when petitioner's income was

known, each officer's salary for that year would be fixed and all or a part of the loan account would be closed out with a salary charge.

This method seems to have been pursued largely upon the advice of the accountant. The testimony of the accountant who said he was a certified public accountant is replete with equivocal statements but he seemed to have been of the opinion that end-of-the-year salary determinations were quite normal and proper for corporations similar to petitioner. He also seemed to be of the opinion that the early fixing of salaries at the special meeting of the stockholders in 1951 ($12,000 for the president and $4,800 for the vice president) set forth the maximum amounts of the withdrawals that could be charged to salary and any withdrawals in any year that did not exceed these amounts would be justified. He said he was present at most of the yearend meetings of the stockholders of this corporation. He even advised the officers they could in some years draw over what he considered the "maximum" ($12,000 and $4,800) to make up for the years they had drawn less than the maximum. He said he made pencil memoranda of what occurred at these meetings from which he would have the minutes typed at a later date. Some times he would have the minutes typed 2 or 3 years after the meeting. For instance it was his testimony that he was present at the meeting of April 18, 1962, and made notes but did not type up the minutes from these notes until June of 1963. Between these dates he was visited by an internal revenue agent. He told the agent the minutes of this meeting did not exist but he could not remember whether he had also told him no notes of the meeting existed and then added "I may have told him that." The accountant's testimony is full of conflicting statements. The documents introduced as minutes, especially the minutes for April 19, 1961, and April 18, 1962, bear all of the earmarks of instruments prepared, probably after the salary deductions were being questioned, to bolster a theory that withdrawals might more easily escape the taint of unreasonable compensation if part was allocated to prior years. The tax return for the period ended April 30, 1962, which is dated July 7, 1962, and which was filed July 10, 1962, bears the accountant's signature as preparer. It states in Schedule E, Compensation of Officers, the amounts of $8,680 paid to Jamshed and $6,320 paid to Estelle as making up the total $15,000 officer compensation.

Little is to be gained by a further discussion of the accountant's testimony or such documentary evidence. It is enough to state that the record shows the amounts deducted as salary for officers bore no relation to the measure or value of the officers' services.

Respondent's computation of the deficiency allows a deduction for compensation for petitioner's president, Jamshed Vesugar, of $1,500

a year. He seems to have had the responsibility for overall management in the sense that his was the final decision on all matters of importance. The one big decision that he seems to have made was the policy decision of delegating almost all of the actual management and operation of petitioner's only property and entire business over to a management firm. However, he testified that he kept some personal records of expenditures drawn from the management firm's monthly statements so that he could compare types and items of expenditures with the experience of other property owners. He testified that he visited the property two or three times a month and contacted the management firm by telephone or visits three or four times a week and saw the accountant three or four times a month. He said he laid down guidelines for the management firm to follow such as whether certain apartments should be rented to tenants with one, or more than one, child. He met with other section owners with respect to rent increase applications and he fixed the rents. On one occasion the rents were fixed at less than FHA authorized maximum because similar apartments across the street were renting for less than this authorized maximum. He said he made decisions about painting and repainting halls, passageways, and windows, and the maintenance of the grounds, including hedges and playgrounds. He was consulted by the management firm on all expenditures of over $40 or $50 and he made rules with respect to decorating apartments when they became vacant. He signed the few corporate checks that were drawn on the company's bank account.

All of the president's testimony was general. It does not tell us the services he performed in any certain year except that he did say new refrigerators were purchased for all of the apartments at his direction in 1959. A study of the president's testimony leaves one with the impression that he was having difficulty showing he did much of anything in the line of day-to-day services for petitioner. The rental of an apartment building is a somewhat passive type of business that involves no inventory or capital turnover. It mostly involves rental and management and, when the officers turn over rental and management to a firm engaged in the rental and management business, there is little left for the officers to do. The record here is very unsatisfactory and we might have been aided by testimony of the salaries paid to corporate officers performing similar duties in other similar corporations. *Gus Blass Co.*, 9 T.C. 15. No such testimony was presented by petitioner though the plain indication in this record is that such evidence might well be available. The management firm representative testified his firm performed similar services for other apartment building owners.

Petitioner seems to rest his claim to reasonableness of the deductions for officers' salaries upon the relationship of the deductions to the

gross income. The record shows petitioner's gross income ranged from about $125,000 in 1957 to over $136,000 in 1962.[1]  The gross income is something to consider but the statute allows the deduction for "reasonable * * * compensation for personal services actually rendered." As stated, we do not know what the prevailing compensation paid to like officers in similar corporations is. But we are convinced this record would support no greater deduction than respondent allowed for the services actually performed by its president. It may seem strange to say the president of a corporation, with net assets that are worth more than $100,000 and a gross annual income of around $136,000, should, as the corporation's only paid officer, only draw $1,500 a year as salary. And yet the test supplied by the statute is the reasonableness of the salary deduction with relation to the services performed. The reason why the president's deductible salary is low is because the corporation has hired a business management firm to run its business for it, which left the president with almost no duties to perform for the corporation. When as here the business of the corporation is rental and management, and both rental and management have been almost entirely delegated to a business management and rental firm, it follows that the corporation cannot deduct amounts it paid its officers as salaries, which amounts could only be justified if the officers were doing what the business management firm does.

Respondent allowed nothing for the services of Estelle. She seems to have had no regular duties to perform for the corporation and no responsibilities. There is a little evidence that she inspected the building and was sometimes consulted by the management firm about decorating the apartments, about landscaping, and about the playground facilities. Here again the record is very unsatisfactory. No deduction at all was claimed for compensation for any services rendered by Estelle for the years 1957 and 1960. We are not convinced the self-serving corporate minutes of 1961 and 1962 constitute any justification for the compensation paid to her during those years. Her services were *de minimis* and could well be explained as voluntarily performed in the interests of her one-half stock investment in the corporation. Any any rate, petitioner did not sustain its burden of showing it was entitled to any deduction for any services performed by Estelle in 1961 and 1962. We hold for respondent on the issue presented.

*Decision will be entered for the respondent.*

---

[1] Petitioner's income tax returns for the fiscal years 1960, 1961, and 1962 report net incomes of $895.23, $859.91, and $1,700.37, respectively.