Dr. Pepper Bottling Company, Inc. v. Commissioner.
Dr. Pepper Bottling Co. v. Commissioner
Docket No. 4453-65.
United States Tax Court
T.C. Memo 1968-13; 1968 Tax Ct. Memo LEXIS 282; 27 T.C.M. (CCH) 73; T.C.M. (RIA) 68013; January 22, 1968. Filed *282 Respondent disallowed a large portion of the salary paid by petitioner to its president and deducted in its return for the fiscal year ended February 29, 1964. The president had not received any salary for many years because of petitioner's financial situation but performed valuable executive services for petitioner throughout the years and in the year at issue in particular. Held: The services rendered petitioner by its president were unique, vital to petitioner's financial success and valuable. Respondent's disallowance of three quarters of his salary is unreasonable. The salary deduction of $12,521.91 claimed is found to be a reasonable allowance for actual services rendered to petitioner by its president in its fiscal year ended February 29, 1964. P. McKinley Harris, Kentucky Home Life Bldg., Louisville, Ky., for the petitioner. Dennis M. Feeley, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined deficiencies in petitioner's income taxes for the fiscal years ended February 28, 1962, February 28, 1963, and February 29, 1964, as follows: 74 Year Ended
Deficiency
Feb. 28, 1962
$ 6,397.17
Feb. 28, 1963
5,059.08
Feb. 29, 1964
11,822.87 The only issue remaining for decision is whether the salary of $12,521.91 paid to petitioner's president during its taxable year ended February 29, 1964, is a deductible business expense beyond the amount of $3,000 allowed by respondent. Certain other unrelated issues have been conceded entirely or settled by the parties, and these can be taken care of in the Rule 50 computation. Findings of Fact Some of the facts have been stipulated and are found accordingly and adopted as our findings. The petitioner is a corporation having its principal place of business at the time the petition to this Court was filed at 2320 Frankfort Avenue, Louisville, Kentucky. *284 The petitioner filed its Federal income tax returns for the fiscal years ended February 28, 1962, February 28, 1963, and February 29, 1964, with the district director of internal revenue at Louisville. During the fiscal year ended February 29, 1964, hereinafter referred to as fiscal 1963, the officers of petitioner were as follows: Robert T. Roark, president; Willette J. Roark, secretary-treasurer; and J.T. Sympson, vice president and manager. The board of directors also consisted of these same three persons. In fiscal 1963, the petitioner had 1,000 shares of $100 par value common stock outstanding. These shares were held by the following persons in the amounts indicated: Shareholder
Number of Shares
Robert T. Roark (president)
100
Willette J. Roark (secretary-treas- urer)
100
Mary Cash
100
Elizabeth Swindle
100
Dan Worth Cash
250
John Swindle, Jr
250
J. T. Sympson (vice president)
100
Total
1,000
Some of the above-named individuals are related by blood or by marriage. Willette J. Roark is the wife of Robert T. Roark, petitioner's president. Mary Cash and Elizabeth Swindle are the sisters of Robert Roark, and Dan Worth Cash and John Swindle, *285 Jr., are their respective husbands. J. T. Sympson, the vice president and manager, is apparently unrelated by blood or marriage to any other officer or shareholder. The petitioner corporation is engaged in the manufacture, bottling, sale and distribution of carbonated beverages and soft drinks in the Louisville area. Robert T. Roark, hereinafter referred to as Robert, established petitioner in 1935, together with another Dr. Pepper Bottling Company at Lexington, Kentucky. Subsequently, he established Dr. Pepper bottling companies at Indianapolis and Muncie, Indiana. Robert, as mentioned, is still president of the petitioner corporation. However, as indicated above, 50 percent of petitioner's stock was held by his two brothers-in-law in fiscal 1963 and Robert and his wife together held only 200 of the 1,000 shares outstanding. During fiscal 1963, Robert owned stock in Pepsi General Bottlers, in the Doctor Pepper Company (Texas), and in the Dr. Pepper Bottling Company of South Carolina, but he exerted no efforts on behalf of and held no official titles or positions with any of these other mentioned soft drink companies. He did, however, actively pursue business interests in cattle, *286 oil and beverage supplies. The beverage supply business was located in Waco, Texas, and was organized as a partnership, selling extracts and other supplies to bottlers. This beverage supply partnership sold only extract to bottlers; it did not sell sugar or syrup. Local bottlers buying from this partnership had to combine their own sugar with the purchased extract in order to produce flavoring syrup. The beverage supply partnership had customers in addition to petitioner corporation and operated at a profit. Robert lived in Louisville from 1935, the year petitioner was established, until 1950. In 1950 he moved to Texas because of his father's advancing age and because certain business interests were located there which would require his attention. At the time Robert left Louisville, the petitioner's profits were low. In order to improve petitioner's position as much as possible, Robert agreed not to take any salary from the corporation although he continued to perform services for it. In 1961 or 1962 Robert determined to devote more time to the affairs of petitioner because its profits had remained at a low level. In the decade, 1950 to 1960, Robert had pressed other business activities *287 with greater zeal. The marketing of soft drinks in the Louisville area is a competitive undertaking, but Robert had a thorough background in soft drink marketing which he could bring to bear on petitioner's situation. 75 Although he decided in 1961 or 1962 to devote greater attention to petitioner's problems, and in fact did thereafter do so, Robert did not return to Louisville. During the years 1961-1962 and through February of 1964, Robert presided over petitioner's fortunes from Texas, leaving routine daily operations in the hands of the resident vice president in Louisville, whose duties were to manage the bottling plant, assume charge of the employed personnel, and supervise other purely local operations and routine matters. This resident vice president owned 100 shares of petitioner's common stock, as indicated above. Robert's responsibilities, in contrast to the resident manager's, were broader in scope. While he gave final approval and considerable attention to many purely local matters, such as the repair of a roof or the erection of a new garage, he concerned himself primarily with the marketing of the product, the handling of all petitioner's franchise, labor and *288 other contractual relationships, all authorization and buying of raw materials such as sugar, and all dealings with grantors of petitioner's franchises. Additionally, Robert was primarily and ultimately responsible for petitioner's financial situation and structure, and he made all financial and major policy decisions. The record does not specifically reveal the level of petitioner's profits prior to the time in 1961 when Robert decided to devote more attention to petitioner's affairs. However, petitioner's corporate income tax returns for the fiscal years ending in February of 1962 (fiscal 1961), 1963 (fiscal 1962), and 1964 (fiscal 1963), reveal a consistent and impressive increase in gross sales, although the corresponding change in profits before taxes does not reflect an increase for the final year due to increases in several important costs and expenses, including Robert's salary, the issue sub judice. Other substantial increases in the costs or expenses of doing business which occurred from fiscal 1962 to fiscal 1963 included a sharp rise in the cost of sugar, far and away the single most significant aspect of petitioner's "cost of goods sold," as well as a dramatic increase *289 in the cost of repairing petitioner's fleet of trucks. During fiscal 1963 the construction of a new garage to modernize petitioner's repair facilities and alleviate maintenance costs was undertaken. Robert made all decisions with respect to this matter, including supervision of the plans and specifications. Extracts from petitioner's tax returns reveal the following financial picture: Fiscal 1961
Fiscal 1962
Fiscal 1963
Gross Sales
$767,098.41
$855,783.10
$948,700.47
Cost of Goods Sold
359,734.14
398,210.41
461,463.06
Gross Profit
407,364.27
457,572.69
487,237.41
Other income unrelated to the sale of soft drinks
6,635.55
7,473.97
8,591.37
Total income before deductions
413,999.82
465.046.66
495.828.78
Total deductions
344,256.91
379,987.52
445,543.39
Net profit (income) before taxes
69,742.91
85,059.14
50,285.39
Going into fiscal 1961, petitioner showed earned surplus and undivided profits of only $82,808.08. There is no evidence to suggest or indicate a stock dividend or split prior to that time. No dividends had been declared for many years. After fiscal 1961, the earned surplus figure increased to $121,963.08 with the addition *290 of fiscal 1961's net after-tax profit; at the end of fiscal 1962, earned surplus showed $168,493.97; after fiscal 1963, the year in issue, earned surplus would have reached a total of $199,815.54 except that a dividend payment of $75,000 was declared in the latter part of 1963. A dividend of $75 was declared payable on each petitioner's 1,000 shares outstanding. Even with the declaration of the substantial dividend, the first in many years, the earned surplus figure at the end of fiscal 1963 was $124,815.54. Thereafter another dividend of $75 per share was declared payable on or before April 30, 1964. Robert's business acumen and attention to petitioner's business and affairs were obviously successful and responsible for petitioner's improved financial situation. The minutes of the November 1963 board meeting authorizing the first of the two mentioned dividends contain the following synopsis of Robert's statement to the board: The chairman stated that the meeting had been called for the purpose of considering the declaration of a dividend. He pointed out that no dividends had been declared because of the financial situation of the corporation and that now that the corporation was *291 in better financial condition it was felt that the shareholders who had their investment in the corporation for some time without any return should receive a dividend. 76 In April 1963, seven months before the meeting authorizing the first dividend, the board had reinstated Robert's salary. The minutes of this April meeting, which immediately followed the annual stockholders' meeting, reflect the following statements and transactions: The chairman then stated that the next order of business was the fixing of compensation of the officers of the corporation. It was pointed out that R. T. Roark as President of the corporation had formerly received a salary but that due to the financial condition of the corporation he had voluntarily requested that his salary be eliminated until such time as the corporation was in better financial condition and that as a result thereof he had received no salary for a number of years although he had constantly rendered his regular and customary services to the corporation. It was the opinion of the Board that since the corporation's business had greatly improved the compensation of the President should be restored so as to compensate him for the *292 services currently rendered. Thereupon, upon motion made, seconded and unanimously carried the following resolution was adopted. RESOLVED: That the salary of R.T. Roark as President of the corporation for the fiscal year ending February 29, 1964 shall be $350.00 per month and 2" per case on all merchandise sold each month in excess of the following number of cases: March
28236 cases
April
29484 cases
May
33891 cases
June
39624 cases
July
45084 cases
August
45708 cases
September
38181 cases
October
31512 cases
November
25740 cases
December
25428 cases
January
23379 cases
February
23322 cases The compensation of said president to continue in accordance with such schedule until changed by this Board of Directors. Upon motion made seconded and unanimously carried the compensation of James T. Sympson as vice president of the corporation for the fiscal year ending February 29, 1964 was fixed at the same amount and to be computed in the same manner as the salary set forth herein for the president for such year, the said compensation being a continuation of the same compensation which had been received by the vice president for the preceding fiscal *293 year. Although the minutes fix Robert's salary by the same formula as the resident vice president's, the amount deducted for Robert's compensation during fiscal 1963 somewhat exceeded the amount deducted for the vice president's compensation. On that year's corporate return Robert's compensation came to $12,521.91, the vice president's to $11,533.90. Total executive compensation was thus only $24,055.81 but there is no explanation for the difference between the amount paid Robert and the amount paid Sympson. Robert's salary from petitioner in the years prior to his departure from Louisville had been in the neighborhood of $8,000 to $11,000 annually. During these years he had devoted his time not only to petitioner's affairs, but also to the three other bottling companies which he established in the region. Thus it is clear he had never served as a full-time officer. While we have found that Robert exercised broad responsibility for petitioner's overall policy, marketing, finances, contracts, and relations with the franchise grantors, we have not, as yet, detailed many of the more specific acts or functions which Robert performed on petitioner's behalf during fiscal 1963. Robert *294 made the following specific contributions to petitioner's operation and business affairs during fiscal 1963: (1) He secured three new and separate soft drink franchises. With a view toward broadening petitioner's marketing base, two of these three franchises were for diet beverages. The two diet beverage franchises secured during fiscal 1963 were for Pommac and dietetic Dr. Pepper. The dietetic Dr. Pepper franchise is an entirely separate contract from the regular Dr. Pepper franchise. Additionally, Robert secured a franchise for petitioner to sell the soft drink, Bubble Up, in the Louisville area. In obtaining the dietetic Dr. Pepper franchise, points of contention arose between the national company and petitioner. Robert negotiated personally with the national officials in Texas and settled many of the contended points in petitioner's favor. Some of Robert's "investigations" of the dietetic market were of an informal nature; for example, he visited the test market area for Pommac while on a trip to California which was made to improve his wife's health. It is apparent, however, that the negotiations for the franchises themselves were not of a casual nature. While the new dietetic *295 franchise was being negotiated, the national Dr. Pepper Corporation attempted to remove one county from petitioner's original 1935 77 franchise for the non-dietetic drink. Robert successfully refused to accept this change in the franchise arrangement, which he felt would be disadvantageous to petitioner. With respect to all the negotiations with the national Dr. Pepper Corporation, Robert's contacts and his experience and intimate and detailed knowledge of the history of the original Dr. Pepper franchise and petitioner's operation over the years were of great benefit to petitioner. During fiscal 1963, while the dietetic franchises were being acquired, Robert considered and rejected the proposal that petitioner enter the canned beverage market. He concluded after study and investigation that the profit margin was too low. (2) As already found, Robert purchased sugar at an advantageous cost to petitioner. Sugar is the most significant single component of petitioner's cost of goods sold. The advantageous purchase necessitated a day-to-day study of the sugar market. Sugar prices in the year 1963-64 were erratic and rising, jumping from a base of $8.65 to a high of $13.20. Petitioner's *296 prices "peaked out" at $10.15, and petitioner was thus able to avoid the $13.20 "high" for the year. The study and effort expended by Robert in his purchase of the sugar was of prime importance and benefit to petitioner. It was of no carryover or residual benefit to Robert's extract-selling partnership, or any of his other business endeavors. As mentioned, the flavoring extract was sold without any sugar content, and Robert held no title or position with any other soft drink company. (3) Robert made the final decisions on pricing the petitioner's products during fiscal 1963, as in all other years. (4) Robert dictated specifications and received and approved bids for the construction of petitioner's new garage building and repair facility. The petitioner during fiscal 1963 owned and operated approximately 16 vehicles. (5) Robert authorized the purchase of new trucks and bodies to the extent he deemed it economically feasible. At least two new trucks and two bodies were authorized and purchased during fiscal 1963. (6) Robert held many discussions and conversations with petitioner's lawyer and resident manager with reference to a collective bargaining agreement concerning petitioner's *297 employees, who numbered approximately 85. Robert specifically discussed the terms of the proposed contract and dictated counter terms. He reviewed each line of the contract and gave final approval to the agreement ultimately entered into. Petitioner's telephone and telegraph expenses during fiscal 1963 came to $2,231.44, an increase of approximately $500 over the previous year's expense, and much of this was due to frequent telephone communication between Robert and petitioner with reference to business matters. (7) Robert received weekly sales reports and a more formal monthly statement which he verified personally by an examination of the books. Because he managed petitioner's finances, many small outlays (e.g., for repairs) received his attention, were studied, and ultimately were approved or disapproved by him. (8) Robert negotiated and renewed the lease on petitioner's office and plant. The buildings were being leased from Robert's sisters who lived in Texas. The rental paid by petitioner during fiscal 1963 has been conceded by respondent to have been fair and reasonable. As with petitioner's salary, the rental formula was based on the volume of petitioner's business. Robert *298 persuaded the landlords to make certain repairs to the building and decided personally to install new machinery and equipment and that petitioner should lease the building again rather than move. Machinery costing many thousands of dollars was purchased and installed in fiscal 1963 at a total cost in excess of $85,000. The installation cost alone as reflected in petitioner's income tax return exceeded $17,500. The decisions dictating this important investment were made by Robert as petitioner's president. In prior years Robert had made trips to Louisville from time to time. During fiscal 1963, however, he made no such trips due to the illness of his wife. However, he made other trips on petitioner's business. The resident manager occasionally traveled to Texas to consult with Robert on company matters. During fiscal 1963, he was present in Texas on at least two occasions to attend meetings of petitioner's board of directors, attended also by Robert. Though Robert was not physically present in Louisville at any time during fiscal 1963, he testified and we find that he expended more time and effort and rendered more valuable and greater services to petitioner in this year than he had *299 in a number of years and particularly since he committed himself to improve petitioner's fortunes during fiscal 1961. 78 On April 23, 1965, respondent determined the deficiencies mentioned above and disallowed all but $3,000 of the $12,521.91 petitioner paid to Robert and deducted as his compensation. Opinion Section 162(a)(1) of I.R.C. 1954 provides that deductions shall be allowed for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including "a reasonable allowance for salaries or other compensation for personal services actually rendered." [1] Petitioner, of course, bears the burden of overcoming the presumptive correctness which attaches to respondent's determination. Ben Perlmutter, 44 T.C. 382 (1965), affd. 373 F.2d 45 (C.A. 10, 1967). Here, respondent has disallowed all but $3,000 of the $12,521.91 which petitioner deducted as Robert's salary. The issue, whether the amount deducted was a "reasonable allowance," is a question of fact, and petitioner's burden is to adduce facts which show that the amount claimed or some larger amount than that allowed *300 was reasonable in the light of all circumstances for the services actually rendered. Miller Mfg. Co. v. Commissioner, 149 F.2d 421 (C.A. 4, 1945), affirming a Memorandum Opinion of this Court; Langley Park Apartments, Sec. C, Inc., 44 T.C. 474 (1965), affd. per curiam 359 F.2d 427 (C.A. 4, 1966). Petitioner has proved to our satisfaction that Robert made significant contributions to petitioner's success during fiscal 1963 and the years immediately preceding. Respondent's contentions on brief may be condensed to three primary complaints. (1) Petitioner's evidence is vague and unspecific; (2) petitioner did not introduce any evidence of comparable salaries paid other Louisville area bottling executives; and (3) petitioner did not account for Robert's time - i.e., how much he devoted to petitioner's business, especially in comparison with the time given his other business interests. Petitioner's evidence consisted mainly of Robert's oral testimony. This was augmented, however, by documentary evidence including tax returns, director's minutes, *301 leases, and correspondence. While Robert's testimony at trial was not as detailed, exact or organized as it might have been, we found him a credible and candid (if somewhat reserved) witness and have concluded that he contributed substantially to petitioner's success during fiscal 1963 and rendered extensive and valuable executive direction and services to petitioner. His contributions have been set forth in considerable detail in our Findings of Fact, and no purpose would be served by repeating them here. More important even than our enumerated findings for fiscal 1963 is our conclusion, based on the entire record, that Robert was responsible for the overall direction of petitioner's affairs and for the "turn-around" which occurred in petitioner's business beginning in 1961. Robert was the dominant executive of the corporation, even though he was only present in Louisville upon occasion over the years and not at all during fiscal 1963. Robert's long experience in the business, his personal contacts with the Dr. Pepper officials, and his knowledge of sugar and other soft drink ingredients all redounded to petitioner's benefit. It is well settled in the tax law that compensation *302 is deductible in one tax year even though it is paid for services rendered in prior taxable years. Lucas v. Ox Fibre Brush Co., 281 U.S. 115 (1930); Perel & Lowenstein, Inc., 237 F. 2d 908 (C.A. 6, 1956), affirming per curiam a Memorandum Opinion of this Court; John C. Nordt Co., Inc., 46 T.C. 431 (1966). The circustances of this case depict a situation where some compensation for Robert during fiscal 1963 for unremunerated services rendered during the two prior years might well have been warranted. Respondent makes the point, however, that such a view of the facts is not permitted by the resolution of petitioner's board which reinstated Robert's salary. The minutes of the board's meeting as to this are set forth in our findings and provided in pertinent part that his salary "should be restored so as to compensate him for services currently rendered." [Emphasis added.] Respondent urges that in light of the above-quoted language, the compensation 79 awarded Robert for fiscal 1963 cannot have been for services rendered in prior years. It is likely that respondent takes too literal a view of the emphasized words, when the entire paragraph, and, more *303 important, the entire record are considered. Small corporations are not prone to draft their minutes with legislative accuracy. Be that as it may, we do not feel compelled to decide the narrow question of whether Robert's 1963 salary represented, in part, compensation for services rendered earlier. We do believe, however, that the lack of any compensation for him during many earlier years and the two eminently successful prior years bear heavily on the reasonableness of his salary, though it be solely for services rendered during fiscal 1963. See, e.g., Templeton, Kenly & Co., Ltd., 6 B.T.A. 61, 63-66 (1927). Cf. Universal Steel Co., 5 T.C. 627, 636 (1945). Respondent has emphasized the fact that petitioner failed to introduce any evidence of salaries paid by similar concerns for comparable services. This comparison is often an important indication of reasonableness. However, failure to present the comparison does not necessarily defeat a petitioner's claim. The failure is particularly without force where, as here, the services rendered are unique and depend largely on the experience, managerial ability, contacts, and special knowledge of the officer who *304 rendered the services. Smoky Mountains Beverage Co., 22 T.C. 1249, 1255 (1954). In the instant case, we strongly suspect that no meaningful comparison was readily available. Under the circumstances, petitioner's failure to provide a salary comparison is excused in light of petitioner's unique situation, and considering Robert's particularly desirable managerial and executive attributes with respect to petitioner's business. These attributes and qualities are all indications that for the services actually rendered Robert's salary was reasonable. Smoky Mountains Beverage Co., supra.See also Gordy Tire Co. v. United States, 115 Ct. Cl. 759, 296 F.2d 476 (Ct. Cl. 1961), and Associated Dental Supply Co., 9 B.T.A. 1022 (1928). Respondent has also emphasized that Robert was necessarily a part-time executive who did not apprise the Court in exact terms of the amount of time which he devoted to petitioner's affairs, either absolutely or in proportion to his other business interests. This omission is not necessarily fatal to petitioner's claim, however. See Miller Mfg. Co. v. Commissioner, supra at 424; Smoky Mountains Beverage Co., supra at 1254. *305 The value of the rendered services goes far to mitigate their part-time character, just as their unique value excused or explained the failure to introduce evidence of comparable salaries. A part-time officer having the skills and abilities demonstrated by petitioner's president may well be worth far more than a full-time executive lacking such qualifications. Cf. Miller Mfg. Co. v. Commissioner, supra. A very important fact in the instant case is that while Robert was the dominant individual in petitioner's history and in its recent success, he did not control the corporation during the year in issue. Fifty percent of the outstanding stock was held by his two brothers-in-law, and 10 percent by the unrelated resident manager. Robert and his wife together owned only 20 percent of the corporation's issued stock. The compensation paid bore no relation to stockholdings. There can be no suggestion of a disguised dividend especially in light of the generous dividends which were actually declared and paid. Further, total executive compensation came only to $24,055.81 against gross profit of more than $487,000, and net profit before taxes (after deducting Robert's salary) *306 of $50,285.39. Of course, it is the reasonableness of Robert's salary which is in issue. The total amount of executive compensation is not directly relevant. See L. Schepp Co., 25 B.T.A. 419 (1932). We wish to emphasize, however, that petitioner was being run for the benefit of its stockholders, with the controlling stockholders not working in any capacity for the business. This central fact not only minimizes the possibility of a disguised dividend, but also makes proper the accordance of some weight, as an indication of the reasonableness of Robert's salary, to the board's action in reinstating that salary when the corporation's financial situation improved after years of hard going. After a very careful consideration of the entire record and for the reasons set forth above, we conclude and hold that the $12,521.91 paid by petitioner to Robert T. Roark for services actually rendered during fiscal 1963 was reasonable compensation for such services. Due to concessions by the parties and to reflect any adjustments required by this opinion, Decision will be entered under Rule 50. 80 Footnotes
1. All statutory references shall be to the Internal Revenue Code of 1954 unless otherwise noted.↩