KEY BUICK COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Key Buick Co. v. Commissioner
Docket No. 10131-74.
United States Tax Court
T.C. Memo 1976-303; 1976 Tax Ct. Memo LEXIS 100; 35 T.C.M. (CCH) 1359; T.C.M. (RIA) 760303; September 27, 1976, Filed Louis H. Anders, Jr.,J. R. Forman, Jr.,Jerry E. Stokes and A. Brand Walton, for the petitioner. Frank Simmons, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent has determined deficiencies in the Federal income tax of petitioner Key Buick Company for the calendar years 1967, 1968 and 1969 in the amounts of $9,600, $101,737.30 and $54,990.88, respectively. The issues for decision are (1) Whether petitioner is entitled to deduct as a salary expense under section 162, I.R.C. 1954, [1] all or any part of the sum of $20,000 paid to its president in 1967, and (2) whether petitioner by virtue of the provisions of section 269 is denied a deduction in 1968 and 1969 of unused net operating loss carryovers which losses were incurred by petitioner in years prior to its acquisition by merger of another corporation in 1968. FINDINGS OF FACT *102 Some of the facts have been stipulated and are found accordingly. Petitioner is a Delaware corporation which had its principal place of business at the time of the filing of its petition in this case at Jacksonville, Florida. It filed its Federal corporate income tax returns for the calendar year 1968 with the Internal Revenue Service Center at Ogden, Utah and its return for the calendar year 1969 with the Internal Revenue Service Center at Chamblee, Georgia. Petitioner, Key Buick Company (formerly Regal Oldsmobile Company, Inc.), is the surviving corporation of a statutory merger pursuant to Delaware law. Effective March 1, 1968, Key Buick Company (hereinafter Old Key) was merged into Regal Oldsmobile Company, Inc. Regal Oldsmobile Company, Inc., the surviving entity, changed its name to Key Buick Company (hereinafter New Key). Thereafter, New Key conducted its business by taking over and operating the dealership formerly operated by Old Key. [2]
Regal Oldsmobile Company, Inc. (Regal) was organized *103 and incorporated under the laws of the State of Delaware in September 1965 for the business purpose of operating an Oldsmobile dealership in San Francisco, California. Regal filed its 1965, 1966 and 1967 calendar year Federal corporate income tax returns with the District Director of Internal Revenue at San Francisco, California. Old Key was organized under the laws of the State of Delaware in August 1960 for the business purpose of operating a Buick automobile dealership in Jacksonville, Florida. Old Key filed its 1967 calendar year Federal corporate income tax return with the District Director of Internal Revenue at Jacksonville, Florida. Old Key was organized by Mr. John Williamson and others to sell automobiles at a profit and in addition to serve as a showcase dealership. Mr. Williamson had organized a company in 1956 for the purpose of performing management consulting services to automobile dealerships. When Old Key was organized, Mr. Williamson and his associates in the consulting firm planned to test management and training techniques they had developed in the operation of that dealership and, if the technique proved successful, to recommend its use to other automobile *104 dealerships. Mr. Williamson also intended to use Old Key to demonstrate how an automobile dealership could be operated in a high grade professional manner. Mr. Williamson was of the opinion that a successful dealership would be a great asset in the marketing of his management consulting firm's services. Upon the acquisition of the franchise agreement for Old Key, Mr. Williamson and his associates began to search for someone to construct the facilities necessary for the operation of the automobile dealership. However, they were not able to find anyone willing to construct a building and lease the property for a reasonable sum because of the type building required for an automobile dealership. Such a building might not be suitable for other uses if for some reason the dealership business were to fail. Some automobile dealerships in the Jacksonville area had not proven to be successful about the time of the organization of Old Key. The investors in Old Key caused Key Real Estate and Investment Company (Krico) to be incorporated under the laws of the State of Delaware in August 1960 for the primary purpose of constructing a building on premises leased to Krico, which building when *105 constructed was to be leased to Old Key. Mr. Williamson also intended for Old Key to serve as a training ground for individuals that Mr. Williamson and his associates were able to recruit into the automobile business. The plan was to have each individual selected after training at Old Key become a stockholder and the franchise holder under a contract with General Motors in an automobile dealership in which Mr. Williamson and his associates would acquire stock ownership. It was the customary practice for the dealer (franchise agreement holder) to have a minimum of 25 percent ownership in the business to satisfy contractual requirements of General Motors in its dealership agreements. In turn, Mr. Williamson and his associates would acquire the remaining 75 percent of the ownership in a particular dealership. After Old Key was well established and began to make a profit, Mr. Williamson and his business associates acquired interests in several other dealerships that sold automobiles manufactured by General Motors. Royal Oldsmobile Company, Inc. (Royal) was incorporated under the laws of the State of Delaware in August 1964 for the business purpose of operating an Oldsmobile dealership *106 in New Orleans, Louisiana. Regal was the next dealership acquired in pursuance of Mr. Williamson's plan. When Regal was incorporated in 1965, the dealer-operator in the contract with General Motors was Tom Kaine. Mr. Kaine had been employed at Old Key and was selected by Mr. Williamson to run the Regal dealership. Colt Buick Company, incorporated under the laws of the State of Delaware in May 1966, was the next dealership established. Colt was created for the purpose of operating a Buick automobile dealership in Cherry Hill, New Jersey. Almost from their inception, each of these dealerships had need for operating capital in addition to the amounts paid in for stock in order to have adequate funds for the operations of the business. [3] In an attempt to alleviate this problem, Krico borrowed funds sufficient to purchase the fixed assets needed in the operation of each of the dealerships and leased the assets purchased back to the dealership. The arrangement provided only temporary relief for the dealerships from the problems of inadequate capital. *107 In 1966, the shareholders of the dealerships decided Krico would take a more active role in their business activities by operating as a management company for the dealerships. The shareholders decided upon a plan whereby Krico would acquire a portion of the stock of each of the dealerships. Pursuant to this agreement, Krico and the dealerships entered into a transaction completed on February 28, 1967. Immediately prior to February 28, 1967, the ownership and capital structure of the dealerships and Krico were as follows. Regal's authorized stock consisted of 30,000 shares of common stock at $10 par value, of which 22,500 were issued and outstanding from the date of initial capitalization in September 1965 and remained unchanged as of February 28, 1967. The outstanding common stock was held as follows: Stockholder
Beneficial Owner [4]
No. of Shares
Thomas M. Kaine
Thomas M. Kaine
5,625
John A. Williamson
John A. Williamson
5,000
John A. Williamson
Cliff Elmore
1,500
James R. Forman, Jr.
James R. Forman, Jr.
2,000
James R. Forman, Jr.
B. P. Head, Jr.
1,375
Thomas W. Perry
Richard F. Smith
1,000
Thomas W. Perry
Ralph C. Ghioto, Jr.
1,000
Thomas W. Perry
J. E. Delfosse
300
Thomas W. Perry
Thomas W. Perry
1,700
Thomas W. Perry
James K. Lloyd
500
Thomas W. Perry
Kenneth R. White
500
John A. Williamson
Ed Mugford
1,000
John A. Williamson
C. Dale Delfosse
500
John A. Williamson
Henry H. Cobb, Jr.
500
Total Outstanding Shares
22,500
*108 Royal's authorized and issued stock consisted of 20,000 shares of common stock with a par value of $10.On February 28, 1967, the outstanding stock of Royal was held as follows: Stockholder
Beneficial Owner
No. of Shares
John A. Williamson
John A. Williamson
6,200
John A. Williamson
A. Vernon Brinson
400
John A. Williamson
J. E. Delfosse
400
John A. Williamson
J. R. Forman, Jr.
3,200
G. D. Fraley
G. D. Fraley
5,000
John A. Williamson
T. W. Perry
1,500
John A. Williamson
A. Vernon Brinson
400
John A. Williamson
A. Vernon Brinson
450
John A. Williamson
Vernon See
200
John A. Williamson
Key Real Estate
& Investment Company
200
John A. Williamson
H. S. Vanderburg
300
John A. Williamson
James E. Delfosse
100
John A. Williamson
Joseph Kehoe
300
John A. Williamson
James R. McKenzie
100
G. D. Fraley
G. D. Fraley
1,250
Total Outstanding Shares
20,000
*109 Old Key's authorized stock consisted of 1,000 shares of Class A voting common stock, $50 par value, and 1,000 shares of Class B nonvoting common stock, $50 par value, of which 900 shares of each class were issued initially and 100 shares of each class issued thereafter so that as of February 28, 1967, all shares of Class A and Class B were issued and outstanding. Immediately prior to February 28, 1967, the outstanding common stock of Old Key was held as follows: No. of Class
No. of Class Stockholder
A Shares
B Shares
John A. Williamson
600
364
Thomas W. Perry
400
100
James R. Forman, Jr.
284
W. H. Borland, Jr.
152
Ralph C. Ghioto, Jr.
100
Total Outstanding Shares
1,000
1,000
Colt's authorized and outstanding stock as of February 28, 1967, consisted of 17,500 shares of common stock, $10 par value. Immediately prior to February 28, 1967, the outstanding common stock of Colt was held as follows: Record Owner
Beneficial Owner
No. of Shares
Cecil Edge, Jr.
Cecil Edge, Jr.
1,750
Thomas W. Perry
Thomas W. Perry
1,750
James R. Forman, Jr.
James R. Forman, Jr.
2,625
John A. Williamson
G. D. Fraley
500
John A. Williamson
Joseph Kehoe
500
John A. Williamson
Irvin F. Grovenstein
500
John A. Williamson
Bernard J. Haddock
1,000
John A. Williamson
Henry H. Cobb, Jr.
1,500
John A. Williamson
%john A. Williamson
3,000
Cecil Edge, Jr.
Cecil Edge, Jr.
2,625
John A. Williamson
Richard I. Whittaker
1,000
John A. Williamson
Bernard J. Haddock
200
John A. Williamson
Henry H. Cobb, Jr.
550
Total Outstanding Shares
17,500
*110 Prior to February 1967 the outstanding common stock of Krico was held as follows: Stockholder
No. of Shares
John A. Williamson
1,333
James R. Forman, Jr.
315
W. H. Borland, Jr.
168
Ralph C. Ghioto, Jr.
100
Thomas W. Perry
84
Total Outstanding Shares
2,000
In February 1967 the Board of Directors of Krico authorized, and the shareholders approved, an increase in the total number of common stock shares from 2,000 shares of $10 par value to 100,000 common stock shares, $1 par value, and the change of each outstanding share of common stock of $10 par value to 10 shares of common stock with a par value of $1. The ownership of Krico common stock immediately before and after the recapitalization was as follows: No. of Shares Before
No. of Shares After Stockholder
Recapitalization
Recapitalization
John A. Williamson
1,333
13,330
James R. Forman, Jr.
315
3,150
W. H. Borland, Jr.
168
1,680
Ralph C. Ghioto, Jr.
100
1,000
Thomas W. Perry
84
840
2,000
20,000
On February 28, 1967, pursuant to a written agreement, Krico acquired beneficial ownership of a portion of the capital stock of Regal, Royal and Colt in exchange *111 for Krico common stock in the following manner: (1) One share of $1 par value Krico common stock for each $13 of par value of Regal stock transferred; (2) one share of $1 par value Krico common stock for each $13 of par value Colt stock transferred, and (3) one share of $1 par value Krico common stock for each $13 of book value of Royal stock transferred, with book value determined as of January 31, 1967, later determined to be $15.19 per share. In addition, 9 individuals agreed to exchange $71,175 in cash for 5,475 shares of stock in Krico (1 share for $13 in cash). With the exception of Thomas M. Kaine, who was the dealer with 25 percent ownership of Regal, all persons who were Regal stockholders as of February 28, 1967, exchanged their Regal stock for stock in Krico pursuant to the agreement. On the same date, all stockholders of Royal, with the exception of G. D. Fraley who held 6,250 shares (25 percent), and all stockholders of Colt, with the exception of Cecil Edge who held 4,375 shares (25 percent), exchanged their respective stock for stock of Krico and the 9 individuals exchanged cash for stock pursuant to the agreement. [5]
*112 The decision of the shareholders of Krico and the dealerships that Krico was to take a more active role in the management of the dealerships was made for a number of reasons. The primary purpose was to increase the net worth of Krico in order to increase its borrowing power from financial institutions. [6] The increase in borrowing power was intended to enable Krico to obtain additional funds to provide cash to the dealerships and also to allow for future expansion of Krico. Another purpose was to provide a base company for management purposes and to aid in the training of managers and salesmen for the dealerships. A third reason was to provide a means by which young potential managers who had been recruited to work in the dealerships could have the opportunity to acquire an interest in the company through the purchase of shares of stock in Krico. The men hired were young men who had recently finished school and had no prior opportunity to acquire any substantial assets. The acquisition of capital by these individuals was important because this stock, or the proceeds received from a sale of the stock back to Krico, constituted a part of the individuals' net worth required in *113 order to be granted a dealership by General Motors. Therefore, when the officers of Krico decided that a particular individual should be the dealer-operator of a franchise acquired in an expansion of Krico's holdings, that individual was able to meet the net worth requirements of General Motors. The ownership of stock in Krico rather than stock in an individual dealership, allowed an individual a greater freedom of transfer of interest in the business. For example, if an employee was transferred from a dealership in Jacksonville to one in San Francisco and he wanted to divest his holdings of stock in the former dealership and acquire a stock interest in the new dealership, permission would have to be obtained from General Motors for both the sale of stock of the former employer and the purchase of stock of the new employer.Transactions in stock of Krico were not subject to such restrictions. *114 Prior to the transaction of February 28, 1967, Colt and Royal had been profitable dealerships, but Regal had not been operating at a profit based on year-end totals for the business.Regal's partial year income tax return for 1965 reflected a loss of $8,248.50 and its return for 1966 reflected a loss of $127,262.80. During January and February of 1967, Krico caused substantial additional funds to be advanced to Regal. On and prior to February 8, 1967, the Bank of America of San Francisco, California had advised Regal and Krico that it would be unable to continue both its floor plan and retail financing of the dealership along with two other commercial loans. Regal was informed by letter that if other financing was obtained for the commercial loans the bank might continue with the floor plan agreement, provided that additional capital was placed in Regal. Substitute financing was then arranged with another bank in the San Francisco area. In 1965 Mr. Thomas Kaine had been selected to be the dealer-operator of Regal when the assets of an existing Oldsmobile dealership were acquired. At the time of his selection, he was employed at Royal in New Orleans. In order to purchase *115 his requisite 25 percent of the stock as the dealer in the contract with General Motors, Mr. Kaine had to make a bank loan to obtain the purchase price. This loan was guaranteed by Krico. From the beginning Regal was not profitable. Mr. Williamson, who was chairman of the board of Regal, and others felt that the cause of the unprofitability stemmed from management problems. In March of 1966, Mr. Thomas Perry, who at that time was general manager of Old Key, went to Regal to attempt to solve the problems that he and Mr. Williamson believed to exist in the management of the corporation. In late 1966 it was determined that Mr. Kaine should be replaced as general manager. The individual selected to fill the position was Dick Smith, another employee of Old Key. Mr. Smith had been assured that if he was able to turn Regal into a profitable operation in the San Francisco area he would become the dealer. Mr. Smith arrived in San Francisco on January 15, 1967 and shortly thereafter when his wife completed the sale of their home in Jacksonville, Florida his family joined him there. Several management changes were made in Regal, new salesmen were recruited and training classes were *116 established for the sales force. In early 1967, Tom Perry from Old Key spent some time in the San Francisco area in an attempt to be of some help in Regal's business. By late March or early April of 1967, Mr. Smith had determined that it was impossible for Regal to operate as a profitable dealership. Mr. Smith made this determination based upon anticipated revenues and expenses that would occur if the sales were to increase. Even with a substantial increase in the number of cars sold it was his belief that Regal could not be made into a profitable business. Due to higher labor costs and other increased costs of doing business in the San Francisco area, it was necessary to sell automobiles at a higher price than Regal's suburban competitors in order to make a profit. Mr. Smith communicated his beliefs to Mr. Williamson, Mr. Perry and others by telephone in late March and also at a meeting held in April in Florida. Within a few weeks after the April meeting, Mr. Smith received word that Regal would discontinue its efforts at its present location. In April, some effort was made to find a buyer for the dealership, but no pruchaser could be found. Consideration was given to relocating *117 the dealership in another location in a nearby area, but this idea was abandoned when satisfactory arrangements could not be made with General Motors. Also the parties considered using Regal's existing corporation to acquire another available dealership, but this was not done because the deficit in Regal would have required additional funds to bring Regal up to the minimum capital requirements of General Motors. In May of 1967, Krico became the sole owner of Regal by making payment as guarantor of the note signed by Mr. Kaine to obtain the funds to invest in Regal when Mr. Kaine defaulted on the note. Krico then accepted Mr. Kaine's 25 percent of the stock in Regal in lieu of foreclosing against him on the indebtedness. On May 27, 1967, the board of directors of Regal adopted a resolution to liquidate the business in San Francisco and seek a location elsewhere. Thereafter, Regal commenced to wind up its business affairs and cease operations in California. In May or June of 1967, it began arrangements to terminate and surrender the franchise agreement between it and the Oldsmobile Division of General Motors Corporation with the alternative of relocation having been abandoned. *118 Also, arrangement was made for the repurchase by General Motors of certain parts, tools and equipment. Late in 1967, Krico determined that it required additional borrowing power. It did not have the borrowing power needed to finance the acquisition of additional dealerships and it also needed to negate the diminution in net worth caused by Regal. At this time consideration was given to the acquisition of Old Key by Krico to increase the net worth of Krico. On December 29, 1967, the stockholders of Old Key entered into an agreement with Krico to exchange their shares of outstanding Old Key stock for shares of Krico. However, this agreement was not completed and an alternative transaction was undertaken. Under the alternative agreement, consummated between January 10, 1968 and February 12, 1968, Krico acquired all of the Old Key stock, 1,250 additional shares of stock in Royal and $85,085 in cash in exchange for stock of Krico at an exchange value of $13 per share. [7]
*119 The transaction occasioned an increase in the net worth of Krico. In February 1968, prior to the acquisition of stock of Old Key, its net worth was $596,000. As a result of the acquisition of Old Key and some additional cash sales of approximately $35,000 in Krico stock, the net worth increased to $907,000 by the end of March 1968. On February 15, 1968, Regal and Old Key entered into an agreement that, effective March 1, 1968, Old Key would be merged into Regal, with Regal the surviving corporation. On February 15, 1968, the stockholders of Regal and Old Key consented to and adopted the agreement. At the time of the merger, each corporation was a wholly-owned subsidiary of Krico. After the merger, the surviving corporation, New Key (formerly Regal), conducted its business by taking over and operating the dealership formerly operated by Old Key in Jacksonville, Florida. After the merger of Old Key into Regal, New Key continued the operation of Old Key from the same location and physical plant without any lapse in time. The officers of New Key were the same as the officers of Old Key prior to the merger. New Key continued to draw its customers from the same areas as prior *120 to the merger. Also, the operating departments such as sales, service and parts, remained the same as before the merger. The reason for the merger of Old Key into Regal was to utilize the net operating loss carryover of Regal because Old Key had been a profitable business. [8] Subsequent to the merger of Old Key into Regal, unused net operating loss carryovers generated by Regal were used to offset income of New Key earned in 1968 and 1969. In the merger of Old Key into Regal to form New Key, Regal's contribution to New Key was limited to the assets, liabilities and operating deficit reflected on Regal's balance sheet as of December 31, 1967. In pertinent part, these included: Assets: Cash
$ 1,488.01
Accounts receivable
35,980.30
$ 37,468.31
Liabilities: Accounts payable
$ 25,086.02
Notes payable
97,896.77
$122,982.79
Net Operating Loss
Carryover
$310,514.88 The franchise agreement under which Regal had operated the Oldsmobile dealership had been surrendered *121 to General Motors in 1967 subsequent to the resolution to liquidate and was not moved. In March of 1968, Krico organized Royal Chevrolet Company which subsequently acquired the assets of Hill Chevrolet Company of Huntsville, Alabama. Krico acquired 60 percent of the common stock of Royal Chevrolet by receiving 22,500 shares of $10 par value stock and also contributed $225,000 of debt capital. To meet necessary financing requirements including capitalization requirements of General Motors, Krico obtained a loan in the amount of $450,000 from a Birmingham bank. As collateral the bank required a pledge of the stock and securities owned by Krico in New Key, Colt, Royal and Royal Chevrolet of Huntsville. The acquisition of Old Key by Krico allowed Krico to borrow the necessary amount to acquire the assets of Hill Chevrolet. In 1968, Krico continued to search for longterm financing to satisfy its requirements for adequate operating capital. During the year it made several proposals to banks and other institutions to acquire the additional funds. Subsequent to February 1968, through August 1973, Krico, either directly or indirectly through its subsidiaries, acquired the assets *122 or stock of five existing General Motors dealerships. In addition, Krico organized one new dealership, an automobile leasing company and a life insurance company.
In 1967 John Williamson was president of Old Key. He received $20,000 from Old Key which deducted the amount as a salary expense. Mr. Williamson was the dealer named in the contractual agreement with General Motors for the Buick dealership in Florida. Under this agreement he was responsible to General Motors for the operation of the dealership. Mr. Williamson advised General Motors at the time the agreement was made that he would not reside in Jacksonville, but would continue to live in Birmingham. Mr. Williamson has worked in the automotive field for a number of years. He became interested in this area while performing part-time work for General Motors while in college. Upon graduation he was first employed as a retail salesman of automobiles and he later worked as a district manager for the Chevrolet Motor Division and at one time was a sales manager for an automobile dealership. In 1956 Mr. Williamson organized a company for the purpose of performing management consulting services to automobile dealerships. *123 Over the years his company has provided services of this nature to General Motors including General Motors' operations in England, Germany and Brazil. During 1967 Mr. Williamson made several trips from Birmingham to Jacksonville for a total of 21 days spent in Jacksonville in connection with the business of Old Key. In addition, he talked on the phone from 2 to 5 times a week with management personnel in Jacksonville discussing the operation of the business including questions concerning inventory, sale price policies and hiring of additional employees. In 1967 Mr. Williamson was the owner of 60 percent of the voting stock of Old Key and 36.4 percent of the nonvoting stock. He also owned approximately 41 percent of Krico after it acquired Regal, Royal and Colt. Mr. Williamson devoted approximately 30 to 35 percent of his time in 1967 to his management consulting business. He devoted 25 to 30 percent of his time to Krico dealerships other than Old Key. Mr. Williamson generally determined the amount of salary he would receive from Old Key. He made this determination on the basis of his judgment of his contribution to the business for the year and what the company was able *124 to afford. Mr. Williamson received a salary of $8,075 from Old Key during 1964; a salary of $18,843.57 from Old Key during 1966 consisting of $9,343.57 paid on January 31, 1966 for services rendered during 1965 and $9,500 paid on December 31, 1966, and $20,000 in 1967.
Old Key paid no dividends prior to its merger into Regal. In his statutory notice of deficiency, respondent disallowed the deduction of $20,000 taken by Old Key as a salary expense to Mr. Williamson for 1967. The notice included the following explanation: (a) It is determined that the deduction claimed in the amount of $80,197.46 in the tax year ended December 31, 1967 as compensation of officers is excessive to the extent of $20,000.00. The disallowed amount represents the salary paid to your president, J. A. Williamson, which is determined to be unreasonable. Section 162 of the Internal Revenue Code. Respondent also disallowed the deduction taken by New Key for net operating losses with the following explanation: (b) It is determined that no net operating loss deductions are allowable in the tax years ended December 31, 1968 and December 31, 1969. Accordingly, the amounts claimed *125 as net operating loss deductions are disallowed and taxable income is increased by the amounts of $310,514.48 and $104,114.64 in the tax years ended December 31, 1968 and December 31, 1969, respectively. OPINION Section 172 provides the statutory authority for a surviving corporation of a merger to deduct an amount equal to the aggregate net operating loss carryover incurred by it prior to the merger. However, section 269 [9] provides for a limitation on the deductibility of net operating loss carryovers where a person [10] acquires control of a corporation with the principal purpose of the acquisition of control being the evasion or avoidance of Federal income tax by securing the benefit of a deduction which such person would not otherwise enjoy. *126 The sole ground upon which respondent has urged disallowance of the net operating loss deduction in this case is that the transactions beginning with acquisition of control of Regal by Krico on February 28, 1967, and ending with the merger of Old Key into Regal on March 1, 1968, were integral steps of an organized plan by Krico, the principal purpose of which was to obtain the tax benefit of Regal's net operating loss carryover as a deduction against the profits to be earned by New Key, a deduction which Regal would not otherwise have been in a position to enjoy. Petitioner contends that for section 269 to prohibit the net operating losses of Regal being used as a deduction in computing the taxable income of New Key for 1968 and 1969, two requirements must be met. Petitioner states that these requirements are (1) an acquisition of control by Regal of Old Key and (2) the principal purpose of that acquisition being to evade or avoid Federal income tax. Petitioner contends that neither of these requirements of the statute is present in this case and therefore section 269 does not deny the benefit of the net operating loss carryovers to New Key. It is petitioner's contention that *127 the merger of Old Key into Regal at a time when both were wholly owned subsidiary corporations of Krico is not a transaction subject to application of section 269 because of the common control exception found in section 269(a)(2). If our inquiry were limited to the final transaction involving the merger of Old Key into Regal, petitioner's position would be correct. The merger of Old Key into Regal was the necessary step to bring about the utilization of the net operating losses generated by Regal against post acquisition income of the profitable Jacksonville, Florida dealership. However, our inquiry is not limited to this transaction. The acquisition of control and improper motive may be reflected through a single transaction or be the result of a series of transactions. Scroll, Inc. v. Commissioner,447 F. 2d 612 (5th Cir. 1971), affirming a Memorandum Opinion of this Court. Petitioner further contends that even if the transactions beginning with the acquisition of Regal by Krico and culminating with the merger of Old Key into Regal are considered part of a unified plan, section 269 is inapplicable. Petitioner contends that the acquisition of Regal by Krico *128 was for business reasons and not for the principal purpose of avoidance of income tax. Petitioner maintains that on February 28, 1967, Krico acquired Regal solely for several reasons of a business nature without any intent of tax avoidance. In our view the issue of whether the transactions were an integral plan and the determination of whether the principal purpose of the transactions was tax avoidance are inseparable under the facts of this case. Petitioner's position is (1) that Krico acquired Regal for business reasons with the intent of operating the dealership at a profit, (2) that only after finding that because of factors over which it had no control this could not feasibly be accomplished did it consider how to cease Regal's operations in San Francisco, (3) that attempts were first made to move the business or the franchise, and (4) after these efforts proved unsuccessful Old Key merged into Regal. If we accept these contentions of petitioner, it follows that the acquisition of Regal by Krico and the merger of Old Key into Regal were not an integrated transaction and it also follows that tax avoidance was not the principal purpose of the acquisition by Krico of control *129 of Regal. The intent of Krico at the time of its acquisition of Regal must be determined by examination of the events surrounding the acquisition and an evaluation of the entire record in this case. J.T. Slocomb Co.,38 T.C. 752, 764, aff'd 334 F. 2d 269 (2d Cir. 1964). Since the applicability of section 269 is dependent on the reason for the acquisition of February 28, 1967, the examination of the entire record is for the purpose of determining intent at that date. If facts were present to show that petitioner subsequent to to the date of acquisition of control of Regal took action with a principal purpose of tax avoidance, those facts are relevant only as they might indicate intent at the time of acquisition. The intent at the time of acquisition is the factual determination that must be made. See Hawaiian Trust Co., Ltd. v. United States,291 F. 2d 761, 768 (9th Cir. 1961). After a thorough examination of the record, it is our conclusion the acquisition of control of Regal by Krico and the subsequent events culminating in the merger of Old Key into Regal were not component parts of a unified plan, the principal purpose of which *130 was to evade or avoid Federal income tax. Petitioner, through its president offered several reasons of a business nature which were the basis of Krico acquiring all of the stock of Regal, Royal and Colt except for the required 25 percent holdings remaining with the franchise holder listed in the contract with General Motors. Petitioner's president testified that the primary purpose for the acquisition of the 3 automobile dealerships by Krico in 1967 was to increase the aggregate net worth of Krico so that one entity would have sufficient borrowing power to be able to provide the needed additional working capital for the present dealerships and to provide funds for future expansion. In addition Krico was to be the vehicle for future acquisitions and also to act as a parent management company. The acquisition of the dealerships in such a manner that they were subsidiary corporations of Krico did have a great impact on Krico's balance sheet. Aggregate net worth of Krico increased from $169,692.78 on January 31, 1967 to $533,953.88 on March 31, 1967 by including land at cost and $632,212.18 by including land at fair market value. The transaction also brought additional cash of *131 $52,050 into Krico between January 31 and February 14, 1967 of a total amount of $71,175 obtained pursuant to the transaction for 5,475 shares of Krico sold in anticipation of the transaction to be consummated on February 28. The parties have stipulated that substantial funds were infused into Regal. The balance sheet of Krico reflects an increase in the notes receivable account of Regal from $12,500 on December 31, 1966 to $62,000 on January 31, 1967 and to $87,500 on March 31, 1967. Respondent maintains that if the primary purpose of the February 28, 1967 transaction was to increase the borrowing power of Krico, there was no reason to include Regal. It is respondent's position that there is no evidence to indicate how the acquisition of Regal, with its large operating deficit and problems in obtaining financing, helped Krico to obtain the needed additional working capital for the dealerships. Respondent points to the fact that by the date of the acquisition of Regal its operating deficit had grown to over $135,000. If Regal had been the only corporation acquired on February 28, 1967, there is little doubt that it would have offered no help to Krico. However, 3 corporations *132 were acquired on the same date, two of which were operating at a profit. It is clear that Krico's aggregate net worth was increased by approximately $100,000 on the date of acquisition based upon the stipulated book value of Regal. Regal's borrowing problems under its floor plan requirements stemmed from its poor earnings picture and it is evident the stock of Regal used as collateral by Krico would have some value based solely upon liquidation value or net asset value of Regal even though it had a deficit in earnings. Further, if Regal had not become a subsidiary in the acquisition, there would shortly have been a point where Krico could not have advanced funds to Regal. There would have been no justification in using increased borrowing power of Krico to provide funds to Regal in attempting to make it a profitable dealership. Regal's earning picture as a sole corporation was such that it would not have been too long before it had no borrowing power on its own behalf. Without borrowing power from independent sources, Krico's directors might not have been acting in good faith to its other shareholders by continuing to advance funds to Regal unless Regal could repay its obligations. *133 However, the acquisition of Royal and Colt, which were making a profit, was beneficial in obtaining funds to advance from Krico to Regal. With the acquisition of Regal by Krico, there was some chance for continued survival of Regal. It is clear that when Regal was acquired the parties believed it had potential to operate as a profitable dealership in the future. The owners prior to the acquisition believed the problems stemmed from management difficulties. The general manager was replaced and a new manager was installed in January 1967. The new manager was informed that if he was able to turn the dealership around he would become the franchise holder. It is clear that at this time the parties believed Regal had promise even though it had theretofore not been successful. The new manager sold his home in Florida shortly after his arrival in San Francisco and his family moved to the area. The management personnel was substantially changed, new sales personnel were hired and programs were begun to recruit and train salesmen. These plans were implemented prior to the acquisition of February 28.In our view these actions taken in January, February and March were taken with the *134 belief that Regal had a future and were not mere window dressing for the events that ultimately followed. The acquisition of Regal was consistent with the implementation of the plan of establishment of a parent to provide a management base for further expansion. At the time of acquisition all other dealership agreements entered into had become successful after a period of time. Other reasons offered by petitioner have substance and are consistent with the plan to operate the business in a new way. The new managers to be used in expanding the number of dealerships were to come from recruited employees. Providing a prospective new manager with a means to acquire capital was important for the future when he would be required to raise 25 percent of the capital necessary to obtain a franchise agreement with General Motors. Once the scheme of a parent management company and subsidiary dealerships became operational, the plan of expansion has been successful as a number of new dealerships have been acquired or formed and all existing subsidiaries but Regal survived. In order to sustain respondent's sole theory in this case, it is necessary to find the principal purpose was to avoid *135 or evade taxes upon the acquisition of Regal by Krico. We have found as a matter of fact that acquisition was for other reasons and not for the prohibited purpose under section 269. Therefore, petitioner has met its burden of proof as the issue has been placed before us. Respondent has also maintained the provisions of section 269(c) [11] are applicable because the adjusted basis of the acquired corporation's property and potential tax benefits obtained from the use of net operating loss carryover were substantially disproportionate to the consideration received by Krico when it purchased Regal's stock. The presumption created by this section is merely a procedural device and not a conclusive presumption. Industrial Suppliers,50 T.C. 635, 646 (1968). We have found that the acquisition of Regal was not for the principal purpose of avoidance of income tax.In our view the business purposes which petitioner has shown for Krico's acquisition of Regal are sufficient to overcome any presumption which might arise under section 269(c). [12]Glen Raven Mills, Inc.,59 T.C. 1 (1972). Also see H.F. Ramsey Co.,43 T.C. 500, 517 (1965). *136 Respondent takes the position that petitioner has failed to justify the reasonableness of the compensation paid to its president Mr. Williamson and as an alternative ground of disallowance that the payments were disguised dividends. Section 162, [13] provides deduction by a taxpayer of ordinary and necessary business expenses paid or incurred during the taxable year including a reasonable allowance for salaries. The question of what amount is a "reasonable allowance" for a particular employee is a question of fact. It is incumbent on petitioner to prove the amount of salary paid to an officer which is reasonable payment for that officer's services. Botany Worsted Mills v. United States,278 U.S. 282 (1929). *137 From the facts of record, we conclude that Mr. Williamson performed valuable services for petitioner. Mr. Williamson had a lengthy background in the retail automobile business and extensive knowledge of this business. For the year in issue he was president of his own successful management consulting firm offering services to automobile dealerships. After an initial start-up period, Old Key became more profitable each year. General Motors had been apprised upon granting the franchise to Mr. Williamson that he would not reside in the Jacksonville area and this arrangement was acceptable to General Motors. During the year Mr. Williamson kept relatively close contact by telephone with the other officers and employees at Old Key. However, he was in the Jacksonville area on business only 21 days.Respondent based his argument that any salary deduction for Mr. Williamson was unreasonable on the fact that he lived in Birmingham and had several other business interests. The fact that Mr. Williamson's services were on a part-time basis or that he did not maintain an office at the business in Jacksonville does not prevent a deduction for salaries paid. Smoky Mountain Beverage Co.,22 T.C. 1249 (1954). *138 However, it does have some affect on the amount of salary reasonable for Mr. Williamson's services. We are satisfied Mr. Williamson's services were valuable to Old Key because of his knowledge of the business and his contribution to many of the routine business decisions. Certainly the value of his services to the corporation was not deminimus. See Langley Park Apartments, Sec. C,Inc.,44 T.C. 474, 484 (1965), aff'd per curiam 359 F. 2d 427 (4th Cir. 1966). However, Mr. Williamson's services were certainly not as valuable to Old Key as would have been the services of a full-time president. The comparisons to payment of salaries by other dealerships to which Mr. Williamson testified were for a full-time principal officer. There is also merit to respondent's alternative position that part of the payments constitute a dividend in disguise. Although his salary was lower than any of the other corporate officers of Old Key, the amount was determined by him and did not receive approval of the board of directors. The amount was based upon Mr. Williamson's determination of how much the corporation could afford to pay and how much he felt *139 his services to the corporation were worth. The corporation paid no dividends for the year and the characterization of the payments as salary is more advantageous to the corporation. See Dielectric Materials Co.,57 T.C. 587, 591 (1972); Botany Worsted Mills v. United States,supra.
Based upon a consideration of all factors including Mr. Williamson's knowledge of the automobile business, the success enjoyed by Old Key, the salary arrangement of Old Key as compared to other dealerships, time spent by Mr. Williamson on Old Key's business activities and the dividend policy of the corporation, we find that the corporation is entitled to a deduction of $10,000 as a reasonable salary payment to Mr. Williamson for the year 1967.
Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. Key Buick Company (New Key) is the corporation liable for any deficiency in income tax as finally determined against New Key or Old Key for the taxable years in issue.↩
3. Under the contractual arrangements with General Motors, the investors were required to meet capital standard requirements. These requirements would, in part, be based on a forecast of the number of units that a particular dealership would sell in a year's period. For example, Royal was required by General Motors to have $200,000 capitalization based upon projected sales of 600 cars a year. However, Royal, Regal and Colt sold units in excess of the number projected which caused a shortage of working capital.↩
4. In Regal, Royal and Colt the shareholder of record was not necessarily the beneficial owner of the shares of stock. Ownership was held as set out above to satisfy requests of General Motors. Each of the dealerships had required additional capital but the owners could interest only individual investors with small sums of money to invest, thus requiring a larger number of investors to raise the additional capital. For example, Oldsmobile wanted no more than three stockholders in Royal and the stock was held in this manner to satisfy Oldsmobile's request.↩
5. The parties stipulated as follows: The Regal stockholders exchanged collectively 16,875 shares of Regal stock with a book value of $6.03 per share aggregating $102,746.50 for 12,980.76 shares of Krico with a book value of approximately $8.28 per share aggregating $107,480.69 or 20.15 percent of the shares outstanding of Krico immediately after the acquisition. The same persons who held and exchanged Regal stock in the transaction collectively held (1) 11,440 shares of Royal stock, which were exchanged for 13,320.457 shares of Krico stock, or 20.68 percent of the Krico shares outstanding immediately after the acquisition and (2) 9,425 shares of Colt stock which were exchanged for 7,248.998 shares of Krico stock, or 11.25 percent of the Krico shares outstanding immediately after the acquisition. Therefore, immediately after the acquisitions Messrs. John A. Williamson, James R. Forman, Jr., Ralph C. Ghioto, Jr. and Thomas W. Perry collectively owned 44,193 shares of Krico stock, or 68.94 percent of the Krico shares outstanding.↩
6. The net worth of Krico on January 31, 1967 prior to the acquisition of stock of the dealerships was $169,692.28 by including in net worth reappraised surplus of $107,844.89 representing the appraised value of real estate rather than its book value and by including in paid-in surplus $32,446.20 which had in fact been received by Krico from some of the 9 individuals who were to participate in the transaction of February 28, 1967 and who had contributed money in anticipation of the acquisition being completed. The net worth of Krico on March 31, 1967 was $533,953.88 if real estate were included at book value and $632,212.68 if real estate were included at appraised value. Total outstanding shares of Krico on March 31, 1967 were 64,395 shares.↩
7. As of January 1, 1968, prior to the acquisition of stock of Old Key by Krico, the percentile ownership of the stock of Krico and Old Key was as follows: Stockholder
Krico
Old Key
John A. Williamson
41.26%
48.20%
James R. Forman, Jr.
16.13
14.20
Ralph C. Ghioto, Jr.
2.73
5.00
Thomas W. Perry
8.10
25.00
Sub Total
68.22%
92.40%
W. H. Borland, Jr.
2.59
7.60
All Other Stockholders
29.19
Total
100.00%
100.00%
Krico owned 100 percent of the stock of Regal.↩
8. The taxable income of Old Key for 1964 through 1967 as reported on its income tax returns was $76,925.69 in 1964, $87,503.77 in 1965, $83,411.04 in 1966 and $162,056.97 in 1967.↩
9. Section 269(a) provides as follows: SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX. (a) In General.--If-- (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation. ↩
10. The term "person" includes a corporation. Sec. 1.269-1(d), Income Tax Regs.↩
11. SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX. * * *
(c) Presumption in Case of Disproportionate Purchase Price.--The fact that the consideration paid upon an acquisition by any person or corporation described in subsection (a) is substantially disproportionate to the aggregate-- (1) of the adjusted basis of the property of the corporation (to the extent attributable to the interest acquired specified in paragraph (1) of subsection (a)), or of the property acquired specified in paragraph (2) of subsection (a); and (2) of the tax benefits (to the extent not reflected in the adjusted basis of the property) not available to such person or corporation otherwise than as a result of such acquisition, shall be prima facie evidence of the principal purpose of evasion or avoidance of Federal income tax. This subsection shall apply only with respect to acquisitions after March 1, 1954. ↩
12. Because of this holding, it is unnecessary for us to determine whether in fact the consideration was disproportionate. We note that Krico acquired Regal stock of a book value of $102,746.50 for Krico stock of a value of $107,489.69. However, at the time Regal had a deficit in earnings of about $135,000.↩
13. The regulations under sec. 162 provide: Sec. 1.162-7(b)(3) [Income Tax Regs.] Compensation for personal services. * * *
(3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned. (4) For disallowance of deduction in the case of certain transfers of stock options, see section 421 and the regulations thereunder.↩