CHEVY CHASE MOTOR COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Chevy Chase Motor Co. v. Commissioner
Docket Nos. 8290-73, 8619-75.
United States Tax Court
T.C. Memo 1977-227; 1977 Tax Ct. Memo LEXIS 214; 36 T.C.M. (CCH) 942; T.C.M. (RIA) 770227; July 21, 1977, Filed *214 Held, reasonable compensation for petitioner's president and sole stockholder determined. Held further, a portion of that compensation must be capitalized pursuant to sec. 263, I.R.C. 1954. Wallace E. Whitmore,Michael W. Sacks, and Dennison L. Mitchell, for the petitioner. John B. Pohl, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in petitioner's *215 income taxes: Year
Deficiency
1967
$ 1,603.00
1968
8,323.00
1969
28,916.00
1970
26,001.00
1971
27,988.00
1972
28,108.00
1973
28,920.00 The issues are whether the compensation paid to petitioner's president and sole stockholder for 1967 through 1973 was reasonable and, assuming that all or a portion of it was reasonable, whether any of that compensation must be capitalized pursuant to section 263. [1]
FINDINGS OF FACT Some of the facts were stipulated and are found accordingly. Petitioner timely filed its income tax returns for 1967 through 1973 with the District Director of Internal Revenue, Baltimore, Maryland. Petitioner, a Maryland corporation, maintained its principal place of business at 7725 Wisconsin Avenue, Bethesda, Maryland, when it filed its petition relating to the deficiencies for 1967 through 1970 (Docket No. 8290-73) and at 6900 Wisconsin Avenue, Chevy Chase, Maryland, when it filed its petition relating to the deficiencies for 1971 through 1973 (Docket No. 8619-75). Petitioner was engaged in the business of buying, selling, developing, and renting *216 real estate during the years in question. Petitioner's president and sole stockholder, Arthur H. Bowis (hereinafter Bowis), whose salary is in issue here, immigrated to the United States in 1923 after attending schools in England and Germany. After establishing his residence in this country, Bowis held numerous positions of increasing responsibility in businesses related to the automobile industry. He was general manager of a Chevrolet dealership immediately prior to organizing petitioner. Bowis founded petitioner, Chevy Chase Motor Company, Inc., in 1940. Petitioner originally sold and serviced Chevrolets. Under Bowis's direction, petitioner became one of the most successful Chevrolet dealerships in the country. Bowis also began to develop skills in the real estate field and purchased, on petitioner's behalf, the land and building at 7725 Wisconsin Avenue in Bethesda, Maryland, from which to run petitioner's automobile dealership. From 1940 to 1965, Bowis was involved in more than fifty real estate transactions both through petitioner and individually. In addition, Bowis was active in the Bethesda Chamber of Commerce and was instrumental in the widening of a local highway *217 and the acquisition and maintenance of municipal parking facilities. Bowis also served on the real estate appraisal committee of the Bank of Bethesda. He valued real property to enable the bank to determine whether to make a loan secured by such property and the amount of such loan. Bowis enjoyed a reputation among real estate professionals of always being wellversed on the facts critical to making a real estate investment decision. In 1965, at the age of 61, Bowis decided to remove himself from the daily pressure of the automobile business and concentrate on real estate. Accordingly, he had petitioner sell its automobile sales and service assets, exclusive of real estate, to a newly formed corporation, Chevy Chase Cars, Inc. Bowis owned 78 percent of the stock of Chevy Chase Cars, Inc., at its formation. His son and an unrelated party owned the remaining 22 percent. Bowis spent approximately one-third of his time advising his son of the operation of the automobile dealership and received the following salary for his services: 1967
$23,289
1968
24,397
1969
24,829
1970
833 In 1970, Bowis's interest in Chevy Chase Cars, Inc., was redeemed by that corporation; *218 thereafter he received no salary from Chevy Chase Cars, Inc.
After selling the automobile assets in 1965, Bowis intended to continue petitioner's real estate activities in the Bethesda area and to begin speculation in Florida land. To that end, Bowis built a second home in Sarasota, Florida, in late 1966. Bowis maintained a home in Maryland and one in Florida from 1967 through 1973. He spent approximately two to three months a year in Florida during the earlier years in issue and approximately five months each year from 1971 through 1973. As stated above, from 1966 through 1973, petitioner was engaged in buying, selling, developing, and renting real property. Bowis, with the exception of a bookkeeper, was its sole employee. He wanted to build petitioner into an operation that would produce $200,000 rental income annually from which he hoped to receive a $100,000 salary. In 1966, Bowis signed a contract with the Vesta Construction Co., Inc., for the erection of a new building on petitioner's property at 7725 Wisconsin Avenue, Bethesda, Maryland. Bowis had planned for this new facility for 10 years and although it was originally designed as a new car showroom with a service *219 area, it was adaptable to a variety of different uses. The construction of the building was completed in 1967 at a total cost to petitioner of $545,000. Although Bowis had hired an architect to supervise the construction, he nevertheless made daily inspections of the construction site and was obliged to make decisions on petitioner's behalf regarding departures from the original drawings and specifications. In addition, Bowis, was required to verify and pay the progress billings of the Vesta Construction Company. Petitioner capitalized all construction costs and the architect's fees. Finally, Bowis's activity on this project included the direction of a variety of finishing details such as replacement of defective tile flooring, painting, and electrical work. Upon completion of the structure, petitioner leased the building and the land to Chevy Chase Cars, Inc. The rent charged was based on a percentage of the cost of the building and could have been obtained from any of a number of interested parties. Chevy Chase Cars, Inc., occupied the property as petitioner's lessee from 1967 through 1973. In 1966, petitioner purchased an undeveloped lot (known as the Parklawn property) *220 in an industrial park.After an unsuccessful attempt to find a suitable light industrial tenant for whom to develop the property, Bowis had it surveyed and graded and provided paving, fencing, and lighting. Petitioner then leased it to Chevy Chase Cars, Inc., for use as a new car storage lot. Chevy Chase Cars, Inc., continued to so use the property through 1973. The Montgomery County Council tried to rezone this property in 1971, but petitioner, through Bowis, successfully opposed the rezoning. In 1966, petitioner purchased an unimproved parcel in the Ravensworth Industrial Project in Fairfax County, Virginia, for $119,369.65. In 1968, Bowis contracted on petitioner's behalf for the construction of a one-story warehouse and office building on the premises. This structure was designed in part to meet the specifications of Sunshine Biscuits, Inc., which shortly thereafter signed a ten-year lease with petitioner for one-half of the building. This tenant had been located by a real estate management firm to which a commission of five percent of the gross rentals was to be paid. All three parties (petitioner through Bowis, the management firm, and Sunshine Biscuits, Inc.) were involved *221 in negotiating the terms of the lease. Petitioner employed an architect to supervise construction. The architect's fee was included in petitioner's capitalized cost of construction. During construction, Bowis reviewed the general contractor's progress billings with the architect to make payment adjustments for any unsatisfactory or incomplete work. Bowis also made periodic inspection visits to the construction site. The construction was completed in mid-1969, and the management firm found a suitable tenant for the remaining half of the building. Bowis was intimately involved with the leasing negotiations and initiated a five-year lease on petitioner's behalf. The management firm's regular duties consisted of collecting the monthly rental, deducting its commission, and forwarding the remainder to petitioner. The firm was also responsible for minor repairs. Bowis, on petitioner's behalf, made decisions regarding any material repairs or large maintenance expenditures. Bowis also solved petitioner's problems in obtaining an occupancy permit for the building from the State of Virginia by hiring a Virginian as his engineer. Petitioner held its Ravensworth property until December *222 1972, when it was sold because of the problems associated with a foreign corporation doing business in Virginia. A selling commission was paid on the sale, and petitioner realized a substantial gain. In 1966, Bowis had petitioner invest $460,000 in two adjoining parcels of land on Old Georgetown Road in Bethesda, Maryland. There were two buildings located on this property. One was rented to a small commercial company; the other, which was then vacant, had formerly been occupied by a large national supermarket chain. In 1967, Bowis renegotiated and signed a month-to-month lease with the commercial company on petitioner's behalf. Bowis later negotiated a six-month lease with the United States Post Office Department for the vacant supermarket building and directed the construction work necessary to make the structure acceptable to the Post Office. Because of the short duration of these leases, Bowis actively sought to interest additional tenants in the Old Georgetown Road property. After expiration of the third six-month lease with the Post Office in March of 1969, petitioner leased the building to Pier I Imports. This tenant had been located by a real estate firm. The real *223 estate firm was to collect the rent and deduct its 6 percent commission. Shortly thereafter, in April of 1969, petitioner sold the Old Georgetown Road property for $650,000. Petitioner paid a commission on the sale. In August of 1967, Bowis invested $16,000 of petitioner's funds for an 8 percent interest in a joint venture formed to develop a high-rise condominium-apartment building on Siesta Key in Sarasota, Florida. This investment was known as the Terrace Venture Project.Bowis wrote letters, made telephone calls, and met with other investors both in Maryland and Florida regarding this project. The architect accepted Bowis's recommended location of the building. In 1971, after the building was completed and most of the units had been sold, petitioner disposed of its interest in the Terrace Venture Project at a gain. Also in 1967, Bowis helped organize St. Armand's South, Inc., in which he invested $12,500 of petitioner's money. This constituted a one-fourth interest in the original capital stock of that corporation. St. Armand's South, Inc., was organized to acquire land on St. Armand's Key, Florida, and to build two high-rise apartment towers thereon. Because of his *224 diverse real estate experience, Bowis reviewed contracts and feasibility studies, attended investor meetings in Florida, and made many of the original land acquisition and development decisions for St. Armand's. After a disagreement among the St. Armand's stockholders, it was decided to dissolve the corporation; petitioner reported a gain of $17,500 on its 1968 corporate income tax return after receipt of a $30,000 liquidating dividend. In 1969, Bowis arranged for petitioner's purchase of the Caithness Buick property which was located directly across the street from petitioner's property at 7725 Wisconsin Avenue, Bethesda, Maryland. The property cost $298,000. Bowis negotiated the purchase and obtained financing through the Bank of Bethesda. Subsequently petitioner leased the property to Chevy Chase Cars, Inc., as a used car lot. Late in 1970 petitioner purchased the Challenger Building in Rockville, Maryland. Bowis negotiated the $439,317.90 purchase price. Petitioner assumed the seller's mortgage. The Challenger Building was a two-story office complex that was occupied by five or six tenants when petitioner purchased it. These tenants' leases had short terms; some of *225 them expired shortly after purchase. Bowis felt that the tenants were not particularly strong and tried to find more financially stable tenants. Finally, a real estate firm introduced Bowis to representatives of Mason Research Institute, Inc. (hereinafter Mason); this company wanted to lease the entire building. Lengthy negotiations ensued between Bowis and Mason because Mason wanted to convert the building from an office building to a scientific research center. The negotiations involved a number of agreements regarding the removal of office partitions and the strengthening of sewer lines and electrical circuits. These problems took approximately a year to resolve, and in September of 1972, Mason signed an eighteen-month lease with petitioner. The lease gave Mason an option to purchase, and the rental terms included an escalator clause based on the consumerprice index. The management firm was paid a 6 percent commission for locating the tenant and managing the property. It was the firm's duty to collect the rent and deduct the commission, but the firm had no maintenance or repair responsibilities. Because of the hazards and confidentiality of its research work, the tenant *226 did its own maintenance. Petitioner had responsibility for major repairs. Both the tenant and petitioner were required to carry insurance to cover the variety of risks involved. Also in 1972, Bowis purchased an undeveloped lot on North Tamiami Trail in Sarasota, Florida, on petitioner's behalf. The purchase price was $38,000, and Bowis intended to develop the property when he found a suitable tenant. An offer from a national restaurant chain had to be rejected when Bowis was unable to obtain a special exception from a local zoning ordinance prohibiting use for a restaurant. Petitioner held the undeveloped North Tamiami property through 1973 and later sold it at a profit. In 1973, Bowis invested his personal funds for a one-half interest in a Volkswagen dealership. Although he did not lend much time to this endeavor, Bowis's advice, based on his many years of experience in the automobile business, earned him an additional $2,000 a month.
Also in 1973 Bowis spent a good deal of time attempting to sell or exchange his stock in petitioner. Bowis had become disillusioned with his real estate business because of the treatment it was receiving by respondent's agents. While the *227 business had exceeded Bowis's goal of $200,000 per year rental income, it appeared that he would not be allowed to take his intended $100,000 salary. Therefore, Bowis spent considerable time negotiating for an exchange of stock with a number of real estate investment trusts. Bowis thought that after such an exchange, he would be able to achieve his desired level of income through dividends from the real estate investment trusts and avoid any problems with respondent. During the years in question, Bowis was continually investigating potential new investments for petitioner. Through his many real estate transactions, he made numerous contacts both in the Maryland and Sarasota, Florida, real estate markets. These contacts would correspond with Bowis when they had knowledge that a particular parcel was for sale that might interest Bowis. Bowis spent a considerable portion of his time each year investigating these leads. The number of investments that petitioner made was small in relation to the number of investment opportunities that were analyzed but not consummated for various reasons. Bowis also considered some of these investment opportunities as personal investments, but *228 during the years involved acquired only two parcels with his own funds. One of the parcels was originally to be transferred to petitioner for development but was ultimately sold because of zoning difficulties. In addition to making petitioner's investment decisions, Bowis, as president, was charged with petitioner's general management responsibilities; he reviewed the level of rent generated by petitioner's property, provided insurance coverage for the properties, negotiated the release of leases, attended to law suits filed against petitioner, reviewed and analyzed petitioner's financial position, oversaw and approved all expenditures, and attended to tenant problems and overall repairs. Petitioner's income statements, in abbreviated form, from 1967 through 1973, are as follows: 1967
1968
1969
1970
Rental Income
$143,987
$171,158
$184,811
$220,073
Net Capital Gain
732
79,777
Other Income
7,357
1,258
7,530
14,582
Total Income
$152,076
$172,416
$272,118
$234,655
Bowis's Salary
48,000
48,000
62,000
72,000
Depreciation
68,584
69,959
68,948
66,509
Management Fees
2,308
Other Expenses
62,047
68,190
78,653
87,870
Total Expenses
$178,631
$186,149
$209,601
$228,687
Taxable Income
[26,555)
[13,733)
$ 62,517
$ 5,968
*229 1971
1972
1973
Rental Income
$273,830
$268,826
$234,980
Net Capital Gain
12,039
69,816
4,272
Other Income
8,504
23,282
17,100
Total Income
$294,373
$361,924
$256,352
Bowis's Salary
72,000
72,000
72,000
Depreciation
67,893
59,207
48,203
Management Fees
5,414
5,428
4,103
Other Expenses
99,466
101,689
75,105
Total Expenses
$244,773
$238,324
$199,411
Taxable Income
$ 49,600
$123,600
$ 56,941
The book value of petitioner's assets increased from $1,546,397 at the beginning of 1967 to $1,927,330 at the end of 1973. The value of petitioner's assets was appraised at $4,664,000 during 1975. Unlike petitioner, many real estate firms of petitioner's size have full office staffs. The compensation paid to Bowis as a percentage of petitioner's gross rental income during the years involved was: 1967
33%
1968
28%
1969
33%
1970
33%
1971
26%
1972
27%
1973
31%
Petitioner paid no dividends during the tax years in issue. Respondent disallowed deductions for Bowis's salary for any amounts exceeding five percent of petitioner's annual rental income as follows: Officer's Salary Claimed
Allowed
Disallowed
1967
$48,000
$ 7,200
$40,800
1968
48,000
8,500
39,500
1969
62,000
9,241
52,759
1970
72,000
11,004
60,996
1971
72,000
13,692
58,308
1972
72,000
13,441
58,559
1973
72,000
11,749
60,251
*230 ULTIMATE FINDINGS OF FACT The reasonable compensation for Bowis during the years in question and the amount of that reasonable compensation that must be capitalized under section 263 are as follows: Reasonable
Portion to be
Year
Compensation
Capitalized
1967
$40,000
$2,500
1968
40,000
3,000
1969
55,000
3,000
1970
62,000
3,500
1971
66,000
4,000
1972
66,000
3,500
1973
60,000
3,000
OPINION The issues are whether the compensation paid to petitioner's president and sole stockholder, Arthur H. Bowis, for 1967 through 1973 was reasonable and, assuming that all or a portion of it was reasonable, whether any of that compensation must be capitalized pursuant to section 263.
Section 162(a)(1) provides tht "a reasonable allowance for salaries or other compensation for personal services actually rendered" shall be allowed as a deduction as a business expense. The reasonableness of compensation for services presents a question of fact to be resolved by the particular facts and circumstances of each case. Miles-Conley Co. v. Commissioner,173 F. 2d 958 (4th Cir. 1949), *231 affg. 10 T.C. 754 (1948). Respondent's determination of the amount of reasonable compensation for the years in issue carries with it a presumption of correctness, and petitioner has the burden of proving that a larger amount is reasonable. Miles-Conley Co. v. Commissioner,supra.Respondent contends that Bowis's activity on petitioner's behalf amounted to no more than the services performed by a real estate management firm. Respondent submits that the average fee for such management services during the years in issue was approximately 5 to 6 percent of gross rental income. Basing his calculations on this 5 to 6 percent figure, respondent has disallowed much of Bowis's compensation, for the years in issue, as set forth in the Findings of Fact. Respondent also contends that petitioner's income is passive in nature and that petitioner's business does not demand the more substantial services required to generate income in other businesses. Langley Park Apartments,Sec. C, Inc. v. Commissioner,44 T.C. 474 (1965), affd. 359 F. 2d 427 (4th Cir. 1966).
It is true that Bowis engaged in activities that are ascribed *232 to a real estate management firm. It is equally true that petitioner's main source of income during the years in issue was rental income. Nevertheless, respondent's determination is very wide of the mark. Petitioner's income may have been rental income, but the income was merely the culmination of Bowis's efforts to locate, purchase, and develop profitable real estate. One of Bowis's greatest skills was his ability to understand and analyze the numerous factors that affect real property's income-producing capacity. He was continually referred to potential investments by the many people he had met through his years in the real estate market. Bowis spent much of his time during each of the years in issue investigating and analyzing these investment opportunities, and the financial ability of petitioner to take advantage of them. Many times this investigation led to the rejection of the potential investment for one reason or another. To Bowis's credit, petitioner was very successful.In short, he did far, far more than merely manage realty as a real estate management firm would. Since we have concluded that respondent's determination is incorrect, we must now determine the amount *233 of the reasonable compensation from the record. This is not an easy task since we must glean specific dollar amounts from facts which do not lend themselves to such specificity. However, this is the task the parties have given us, and so we will discharge our duty. "There are no fixed rules or exact standards for determining what constitutes reasonable compensation, for each case must be resolved on its own particular facts and circumstances." Perlmutter v. Commissioner,44 T.C. 382, 401 (1965), affd. 373 F. 2d 45 (10th Cir. 1967). We have considered the qualifications of Bowis, the high degree of success that petitioner had during the years in question, the complexity of the business, and the nature and scope of Bowis's work. We feel no need to review in depth these factors, or the other factors we have considered. We recognize that since Bowis was in control of petitioner's affairs, his salary must be subject to close scrutiny. Dielectric Materials Co. v. Commissioner,57 T.C. 587, 591 (1972). We also recognize that petitioner paid no dividends during the years in question, Perlmutter,supra, at 402, and that Bowis *234 spent approximately a third of his time from 1967 through 1969 in the service of Chevy Chase Cars, Inc. After careful consideration of the entire record, we find that reasonable compensation for Bowis during the years in issue was as follows: 1968
$ 40,000
1969
55,000
1970
62,000
1971
66,000
1972
66,000
1973
60,000
The second issue is what portion, if any, of the reasonable compensation must be capitalized pursuant to section 263. Section 263 provides in part that "[no] deduction shall be allowed for * * * [any] amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." As the Supreme Court stated in Commissioner v. Idaho Power Company,418 U.S. 1, 13 (1974): [Reasonable] wages paid in the carrying on of a trade or business qualify as a deduction from gross income. § 162(a)(1) of the 1954 Code, 26 U.S.C. § 162(a)(1). But when wages are paid in connection with the construction or acquisition of a capital asset, they must *235 be capitalized and are then entitled to be amortized over the life of the capital asset so acquired. Deciding what portion of the reasonable compensation must be capitalized is no easier than deciding the amount of the reasonable compensation in the first place. Again we must glean specific dollar amounts from facts which do not lend themselves to such specificity. When Bowis personally directed construction work on the various projects during the years in issue, his compensation should be capitalized. Perlmutter v. Commissioner,supra at 403. Yet we also recognize that Bowis spent a great deal of his time in the day-to-day operation of petitioner. He reviewed the level of rent generated by petitioner's property, analyzed petitioner's financial position, and attended to tenant problems. After careful consideration of the entire record and scrutiny of Bowis's various activities on petitioner's behalf, we find that the following amounts of the reasonable compensation paid to Bowis must be capitalized: 1967
$ 2,500
1968
3,000
1969
3,000
1970
3,500
1971
4,000
1972
3,500
1973
3,000
Decisions will be entered under Rule 155 *236  Footnotes
1. Statutory references are to the Internal Revenue Code of 1954, as amended.↩